# Charlestown.

## Rose & Co. *et al. v.* Brown *et ux.*

(Absent, Green, President).

Decided September 10, 1877.

1877.
August Term.

1. In a suit where husband and wife are plaintiffs or defendants, the evidence of one cannot be received for or against the other.

2. The twenty-second and twenty-third sections of chapter one hundred and thirty of the Code of West Virginia, make no material change in the common law, as to husband and wife giving evidence for or against each other, in a cause in which they are parties, except in an action or suit between husband and wife.

3. Where the objection to a deposition is as to the competency of the witness, it will be considered by the appellate court, though no objection was made to it in the court below.

4. On the 30th day of September 1872 B. procured a voluntary conveyance to be made to his wife, of a house and lot in C. At the time the conveyance was made, he was not indebted more than $218.00. On that day there was paid on the property $1,500.00, which he had before given to his wife, and within the next two years he had $3,000.00, which, from time to time, he paid on said property, and discharged the purchase money; and debts to the amount of about $1,250.00 had afterwards accumulated, after such conveyance and during the time such payments were being made; these being all the material facts in the case, on the question of fraud. Held:

  I. That these facts are not sufficient to make a *prima facie* case of fraudulent intent, in B., at the time the voluntary conveyance was by him procured to be made; and said conveyance is not fraudulent in fact.

  II. But in fraud of his existing creditors, he did divert his means from the payment of his debts, and invest such means in

said property, so voluntarily conveyed to his wife; and his said creditors can charge the said real estate for the payment thereof.

5. In the case of a purchase by a wife during coverture, the burden is upon her to prove distinctly that she paid for the thing purchased, with funds not furnished by her husband. Evidence that she purchased amounts to nothing, unless it is accompanied by clear and full proof, that she paid for it with her own separate funds. In the absence of such proof the presumption is, that her husband furnished the means of payment.

6. The effect of the repeal of the provision in section nine of chapter one hundred and eighty-six of the Code of 1860, by the adoption of the Code of 1868, which provided that, "if it appear to such court that the rents and profits of the real estate, subject to the lien, will not satisfy the judgment in five years, the court may decree the said estate, or any part thereof, to be sold, and the proceeds applied to the discharge of the judgment," was to restore the chancery practice in enforcing judgment liens, as it existed prior to the adoption of the Code of 1849.

7. Upon a bill to enforce a judgment lien, the court may decree a sale of the land; but it is not bound, and ought not to decree such sale, if the rents and profits of the land will satisfy the liens charged upon it in a reasonable time, unless consent to such sale be made.

8. What is a reasonable time, is a matter of discretion, to be exercised by the court.

9. The discretion so to be exercised is not an arbitrary one, but a sound discretion in the interest of fairness and prudence toward all the parties interested, and is of course, reviewable in the appellate court.

10. To have the real estate rented rather than sold is a privilege accorded to the debtor and others interested, and they must exercise it in the inferior court; and the decree must show that they asked a rental of the property, and it was refused, before the decree, for that reason, will be reviewed in the appellate court.

11. The inferior court must be called on to say, whether in a reasonable time the rents and profits of the real estate will pay the liens charged upon it; and this discretion must first be exercised by the court below, before this Court will *review* the decree of said court; and upon such review this Court will not reverse it unless it appear that the court erred in the exercise of that discretion.

1877.
August Term.
───────
Rose & Co. *et al.*
v.
Brown *et ux.*

12. When however the cause is remanded, the appellate court may give the debtor, or other party interested, a right to apply to the court below to have the inquiry made, whether the rents and profits will satisfy the liens on the real estate in a reasonable time, and to have the judgment of such court thereon.

13. It is error to decree a sale of real estate, without giving the defendant a day to redeem the property by paying the amount charged upon it; and it is not giving a day to redeem, to postpone the time in the decree for the property to be advertised and sold.

Appeal from, and *supersedeas* to, two decrees of the circuit court of Jefferson county, rendered at the March term, 1876, of said court in a cause in chancery, pending then in said court, wherein Joseph Rose & Co. and others, were plaintiffs, and Jacob B. Brown and wife, were defendants.

This appeal was allowed upon the petition of said defendants, Jacob B. Brown and wife.

The Hon. John Blair Hoge, Judge of the third judicial circuit, rendered the decrees appealed from.

JOHNSON, JUDGE, who delivered the opinion of the Court, furnished the following statement of the case :

On the 6th day of September, 1875, Joseph Rose and William P. Rose, partners as J. Rose & Co., A. E. Massman trading under the name of A. E. Massman & Co., Samuel Brown, William H. Williar and Edgar G. Miller, trading under the name of Samuel Brown & Co., The Kabletown and Bloomery Turnpike Co. and J. G. and William P. Harvey, partners as J. G. Harvey & Co., filed their bill in chancery, in the clerk's office of the circuit court of Jefferson county, which alleges that Jacob B. Brown was on and before the 30th day of September, 1872, indebted in various sums, for which they afterwards recovered judgments against him; the bill sets out the amounts for which judgments were had, and the times at which they were recovered. The bill

also alleges that said Brown was also largely indebted to other parties. The bill charges that while Brown was thus largely indebted, on the said 30th day of September, 1872, he purchased from Fayette W. Rawlins, Joseph E. Rawlins and Anna Roberta Rawlins, a lot and the improvements thereon, in the town of Charlestown, in said county, for the sum of $4,500.00, of which $1,500.00 was paid in cash, and the residue, $3,000.00, was paid in two equal annual payments; and that said $3,000.00 the residue of said purchase money had since been paid by said Jacob B. Brown; that with a view of hindering, delaying and defrauding the complainants and other creditors of said Jacob B. Brown, then existing, and also his future creditors, out of debts which he might thereafter incur, the said Brown had the said house and lot and appurtenances conveyed by said Rawlins to his wife, Emily Brown, for her sole and separate use; the said deed was dated the 30th day of September, 1872, and was duly recorded in the proper office on the 4th day of October, 1872; that on all the judgments executions were issued and returned "no property found." That none of said debts and no part thereof have been paid, except about $40.00 to the Turnpike company. That said Emily Brown, the wife of said Jacob B. Brown, when said deed was made, owned no separate property and never paid one cent of the purchase money on said house and lot, but the same was paid for by said Jacob. That at the time said conveyance was made said Jacob was utterly insolvent; and that when he made the two deferred payments on said property he was still more indebted, and the said judgments had then been recovered. The bill prayed that said Brown and wife should be made defendants thereto, and that said deed be declared fraudulent and void as to complainants and all other creditors of said Brown, whose debts were incurred either before or since the execution of the said deed; and that the said property be subjected to the payment of the debts due the complainants; and for general relief. The deed is made an exhibit with the bill,

as also copies of judgments referred to. On the 8th day of November, 1875, Brown and wife filed their separate answers to the bill, to each of which the complainants replied generally, and the court referred the cause to a master commissioner, who was instructed "to ascertain and report the debts of the defendant, Jacob B. Brown, due by judgment, and by bond, note, or open account, existing prior to September 30, 1874," &c.

In said decree it is recited, that it is admitted that the debt due the Kabletown and Bloomery Turnpike Company had been fully paid by said Brown since the filing of the bill, and ordered that the cause be discontinued as to said company, and prosecuted in the name of the other complainants only.

The answer of Jacob B. Brown is in substance as follows: it denies that he was indebted on the 30th day of September, 1872, to the various plaintiffs as set forth in the bill; admits that at that time he was indebted in a small amount to the Kabletown and Bloomery Turnpike Company, and to Massman & Co. in another small sum, about $168.00, of which said sum he paid $100.00, by which payment the debt was reduced to about $68.00; denies that any other debts in the bill mentioned were due, or even made at the time of the purchase by his wife of the realty in the bill mentioned; denies that he bought the property in bill mentioned, and caused the deed therefor to be made to his wife Emily Brown; but admits that anterior to the purchase of said property he gave his wife, the said Emily, $3,000.00, money then in hand, and that she under the advice of friends, and with the approbation of respondent, purchased the said property in her own name, and the deed therefor was made to her, paying therefor $1,500.00 in cash, and $1,500.00 in one year thereafter; that of the residue of said payments the respondent advanced to his wife $500.00 only; the other one thousand dollars was money of her own which she earned in the prosecution of a business separate and apart from the respondent, her husband; denies that he was

insolvent at the time of said purchase, but on the contrary was worth at that time several thousand dollars over and above his just debts; admits that the $500.00 was given to his wife just before the last deferred payment on said property was due.

Mrs. Emily Brown's answer is in substance as follows: that she purchased the property in the bill mentioned and paid for it as follows: $1,500.00 in cash; $1,500.00 in one year; which payments were made out of a sum of $3,000.00, given to her by her husband anterior to said purchase; of the remaining $1,500.00 purchase money, $1,000.00 was paid out of the profits of her own business; and $500.00 was given to her by her husband.

The commissioner filed his report, in which he ascertained the amount of the debts, and their priorities; from which it appears that the amount of the judgments and other indebtedness, with interest calculated to March 1, 1876, amounted to $1,472.60. Nearly all the judgments were recovered in 1874, two of them in 1876, and none in 1875.

There is nothing to show how long the debts had existed, except the time from which interest was calculated by the commissioner. The first judgment bears interest from February 1, 1874; the second, from April 9, 1874; the third, from March 16, 1874; the fourth, from September 11, 1873; the fifth, from September 21, 1874; to this judgment the commissioner has appended this note: "Balance due upon account, beginning August 28, 1872, and ending August 26, 1873, settled by two notes of date January 16, 1874, upon which there was judgment." This is the Massman debt, to which reference is particularly made in Jacob B. Brown's answer. The sixth bears interest from January 20, 1876, judgment on "debt which existed in September, 1873"; seventh, judgment before justice on open account of 17th October, 1873, with interest from that date; eighth, negotiable note dated March 24, 1874, at thirty days, with interest thereon from April 27, 1874.

The following agreement of facts was filed in this cause and made part of the record:

"The house and lot in controversy were purchased from Fayette W. Rawlins, Anna Roberta Rawlins and Joseph E. Rawlins on the 30th of September, 1872, for the sum of $4,500.00; one-third of which was paid in cash on that day; and for the residue the single bills of Jacob B. Brown and Emily Brown were executed, all dated September 30, 1872, for the following amounts and payable as follows, to-wit: one payable to said Joseph E. Rawlins on the 30th day of September, 1873, for $450.00; another payable to same at same time for $50.00; another payable to same on 30th of September, 1874, for $500.00; also one of said bills payable to said Anna Roberta Rawlins on the 30th of September, 1873, $500.00; and another payable to same September 30, 1874, for $500.00; also one payable to Fayette W. Rawlins on the 30th of September, 1873, for $400.00; another payable to same at same time for $100.00; another payable to same on 30th September, 1874, for $378.00; and another payable to same at same time for $122.00—all bearing interest from date; that said single bills were secured by a deed of trust executed by said Jacob B. Brown and wife on the property purchased; and that the same were paid as they severally fell due, or shortly thereafter."

The deposition of Jacob B. Brown, one of the defendants, was taken in the cause by the plaintiffs. The deposition is not very important, although its tendency is to support the plaintiffs' claim.

No exception was taken in the court below to. said deposition, and the witness was cross-examined by defendants' counsel; but no consent was given that it might be read. The depositions of David Howell and John W. Lock were taken only for the purpose of showing that the property could be divided without detriment. The deposition of J. D. Starry was also taken; and he proved that he was the family physician of the defendant, and called to see Jacob B. Brown, who was quite sick; and

1877.
August Term.

R s3 & Co. et al.
v.
Brown et ux.

that it was under his advice that the said property was purchased ; and that he bid the property in when it was sold ; he says on that subject : " I became the bidder when the property was sold ; it was knocked down to me ; I don't remember whether for Mrs. Brown or Jacob Brown ; my recollection is that Mrs. Brown was the principal party in all the conversations on the subject of the purchase of the property." All that part of the deposition of the witness was by the plaintiffs objected to at the taking thereof, which relates to conversations with the Browns ; but no notice is had of the objection in any decree of the court. The foregoing are all the material facts appearing in the record.

The first decree in the cause refers it to a commissioner to ascertain the debts, and their priorities, &c.

The second decree recites, that the "cause came on to be heard on the papers formerly read, the report of commissioner, Cleon. Moore, to which there are no exceptions, the depositions of Jacob B. Brown and of John D. Starry, and the statement of facts agreed between the parties, plaintiffs and defendants ; and was argued by counsel. On consideration whereof the court doth confirm said report. And the court being of opinion that the conveyance of the real estate in the bill mentioned to the defendant, Emily Brown, is in fraud of the rights of the plaintiffs and the other creditors of Jacob B. Brown, whose claims are audited in the said report of commissioner Moore, and is void as to them, doth adjudge, order and decree, that said conveyance be set aside and declared null and void as to plaintiffs and said other creditors, and liable to the debts of the said Jacob B. Brown, so audited in the said commissioner's report. And it further appearing, that a sale of the whole of said real estate will not be necessary to satisfy the claims so audited as aforesaid, and it not appearing, whether or not said property is susceptible of division by consent of parties, it is further adjudged, ordered and decreed that this case be referred to a commissioner of this court, who

is instructed to ascertain and forthwith report to this court, whether said real estate can be divided, and what portions thereof can be most readily sold in satisfaction of liens so audited as aforesaid, and also to ascertain the annual rental value of said property."

The report of the commissioner under said decree states that, "having summoned and taken the depositions of David Howell and John W. Lock, returned with this report, I report that the property in the bill and proceedings mentioned can be divided; that the two story brick store-house can be most readily sold, its annual rental value $200.00, value $1,800.00; annual rental value of the dwelling occupied by Jacob B. Brown, $175.00, and annual rental value of small store-room $100.00.

At the foot of the last named decree appears the following: "Reference, and forthwith report agreed to: Baylor & Wilson, attorneys for Rose & Co., and A. E. Massman & Co.; White & Trapnell, attorneys for J. G. Harvey & Co., Samuel Brown & Co. and Russell & Alger; A. E. Kennedy, for defendants; W. H. Travers, for Tucker, Smith & Co."

Stewart & Co. and Frank & Hammerslaugh were also judgment creditors, as appeared by the commissioner's report, and no consent was made for them; all others except the firm of Tucker, Smith & Co., were made parties to the bill.

The final decree entered in the cause was as follows:

"This cause came on again this 25th day of April, 1876, to be further heard upon the papers formerly read, and the forthwith report of commissioner Moore, returned and filed on the 24th day of April, 1876, to which report there are no exceptions, and was argued by counsel. On consideration whereof the court doth confirm said report. And it appearing from said report that the real estate in the bill and proceedings mentioned is susceptible of division, and that the portion described in the report of the said commissioner as the brick store-house can be most readily sold; it is therefore adjudged,

ordered and decreed, that Edward Tearney, sheriff of the county, after first giving notice of the time, place and terms of sale in some newspaper printed in Charlestown, and by printed posters if he deem it expedient, do offer for sale at public auction the said brick store-house property, upon the terms of one-third cash, and the residue in one and two years' equal payments, with interest from the day of sale; said deferred payments to be secured by the bonds of the purchaser, and a deed of trust on the premises. Said sheriff will report his proceedings to the next term of this court. But the said commissioner shall not advertise said property for a sale thereof to be made before the 1st day of September next. "

From and to the two last mentioned decrees an appeal and *supersedeas* was allowed by this Court.

*U. L. Boyce* and *Andrew E. Kennedy,* for appellants, referred to the following authorities:

*Fox adm'r* v. *Jones et ux.*, 1 W. Va., 205; *Pecks* v. *Chambers,* 8 W. Va., 210; *Pierce* v. *Pierce,* 7 B. Mon., 449; *Crawford* v. *Miller,* 23 Gratt., 836; *Lockhard & Ireland* v. *Beckley, et al.,* 10 W. Va., 87.

*White & Trapnell,* for appellees:

An inquiry into the validity of a gift, conveyance or transfer involves two points: First, the existence of an intent to hinder, delay or defraud; and secondly, the consideration of the gift, conveyance or transfer.

1st. It is not necessary to establish fraud, or an intent to hinder, delay or defraud by direct and positive proof; it is usually established by circumstantial evidence. Bump. on Fraudulent Conveyances, 559; *Kempner* v. *Churchhill,* 8 Wall., 362; *Land* v. *Jeffries,* 5 Rand., 599; *Lockhart & Ireland* v. *Beckley,* 10 W. Va. 87 and *Hunter, ex'or* v. *Hunter,* 10 W. Va. 321

Where the direct and inevitable consequence of an act is to delay, hinder or defraud, the presumption at once

conclusively arises, that such illegal object furnished one of the objects for doing it; and it is upon this ground held to be fraudulent. Bump. on Fraudulent Conveyances, 70-71. *Hunters* v. *Waite*, 3 Gratt., 33-34. The presumption having arisen, the burden of proving the fairness and *bona fides* of the transaction is thrown on defendants, Bump., 286 and 294. In the case of a purchase by a wife during coverture, the burden is upon her of proving distinctly that the property was paid for with *funds that were not furnished by her husband*, Bump., 318, &c., and cases cited.

2d. Whether said conveyance or the several payments on the property were made with intent to hinder, delay and defraud or not, each of said payments constituted a gift without consideration, and was void as to the creditors of Jacob B. Brown, whose debts had been contracted at the time each of said several gifts were made. Code, chapter 71, section 2.

3d. The provision in the Code of 1860 (Virginia) requiring property to be rented, where the rents in five years will pay the debts, having been omitted in our statute, it is not error for a court to decree the sale of so much of a property easily susceptible of division, as will satisfy the debts audited, though the rents would be sufficient to pay them in less then five years.

*Baylor & Wilson,* for appellees :

1st. Each payment upon said property was a gift to the wife at the date of such payment, and void as to existing creditors of Jacob B. Brown. Code of W. Va., chapter 94, section 2.

2d. Not necessary to prove any actual fraud, when debts exist at time of gift. *Ibid.*

3d. The burden is on Emily Brown to show not only that she purchased, but paid for the property with money not her husband's. 3 Gratt., 33 ; Bump. on Fraud. Conveyances 318.

4th. Not error to decree sale instead of rental, when

it appears a rental of four years will pay debts charged.
7 Leigh, 331; 10 Leigh, 394; 6 Gratt., 119.

JOHNSON, JUDGE, delivered the opinion of the Court:

The first point arising in this cause is: should the deposition of Jacob B. Brown have been read upon the hearing of the cause. It is settled that at common law it is not competent testimony, Brown being the husband of his co-defendant Emily Brown. This question has been directly before this Court in *Hill et ux.* v. *Proctor*, 10 W. Va., 59, the court citing the common law rule, as laid down in 1 Greenl. Ev., section 334 &c., held that "the 22d and 23d sections of chapter 130 of the Code of 1868, make no material change in the common law, as to husband and wife giving evidence for or against each other in a case in which they are parties, except in an action or suit between husband and wife." The evidence in the cause just cited was given under circumstances very much like those surrounding this case. Hill's deposition was taken in the cause of *Hill et ux* v. *Proctor*, and details statements favorable to himself and wife against the defendants.

It would be in violation of a clear principle of common law, not interfered with by the statute, to read the deposition of Brown upon the hearing of this cause. But it is argued by counsel for plaintiffs, that no exception was made to reading it in the court below, and it is too late to object here. If the objection did not affect the competency of the witness, and had not been made in the court below or passed upon by that court, it ought to be considered as having been waived and could not be noticed by the appellate court; but affecting as it does the competency of the witness to testify at all in the cause, it will be considered here, although the objection be here made for the first time. *Hill et ux.* v. *Proctor, supra.* The court, therefore, erred in hearing the cause upon that deposition.

The next question is: Was the conveyance procured to

be made by Jacob B. Brown, with the intent to hinder, delay or defraud his creditors? By the 2d section of chapter 74 of the Code, any voluntary conveyance or any gift is void as to creditors, the debts existed at the time. It matters little whether Jacob B. Brown gave his wife the $3,000.00 and she invested it in the house and lot, or whether he bought the property himself with the money and procured the conveyance to be made to her; in either event it would, as to creditors whose debts existed at the time, be void. But the 2d section of chapter 74 of the Code of West Virginia makes a clear distinction between the rights of existing and subsequent creditors, as to a voluntary conveyance; and such a conveyance cannot be impeached by subsequent creditors, on the mere ground of its being voluntary, and the party making it, or at whose instance it is made, being indebted to some extent, if there be no actual fraudulent view or intent in the party at the time; but if it be shown that there was *mala fides*, or fraud in fact, in the transaction, whether the actual fraudulent intent relates to existing creditors, or is directed exclusively against subsequent creditors, the effect is precisely the same, and subsequent creditors may upon the strength of such fraud successfully impeach it. Upon the question of fraudulent intent, or whether the conveyance is fraudulent in fact, as to subsequent creditors, it is proper to consider the circumstances of its being voluntary, and the party indebted at the time; and if additional circumstances connected with those two be sufficient to show fraud in fact, it is void as to subsequent creditors. It is not necessary that there should be direct proof to show the fraud; it is to be legally inferred from the facts and circumstances of the case, where those facts and circumstances are of such a character as to lead a reasonable man to the conclusion, that the conveyance was made with intent to hinder, delay or defraud existing or future creditors. Where the evidence shows such facts and circumstances, as the conveyance being volun-

1877.
August Term.

Rose & Co. et al.
v.
Brown et ux.

tary, the grantor being indebted to a material extent, to the degree of embarrassment, so that the conveyance would probably throw a hazard upon the creditor, and these circumstances are wholly unexplained, it is for the court or jury to say from circumstances like these, whether the grantor intended to hinder, delay or defraud his creditors; and if the circumstances are such, whatever they may be, to make a *prima facie* case of fraudulent intent in the grantor, they are to be taken as conclusive evidence of the fraudulent intent, unless rebutted by other facts and circumstances in the case. *Lockhard & Ireland* v. *Beckley et al.*, 10 W. Va., 87; *Hunter's ex'or* v. *Hunter*, 10 W. Va., 321.

Applying those principles to this cause: Was the conveyance procured to be made to Mrs. Emily Brown with the actual fraudulent intent to hinder, delay or defraud the creditors of Jacob B. Brown? Nearly all the debts audited in this cause appear to have been contracted subsequent to the date of said conveyance. At the time the conveyance was made, as the pleadings and proofs show, the said Brown owed the Kabletown and Bloomery Turnpike Company about $50.00; and by Jacob B. Brown's admission in his answer he also at that time owed to Massman & Co. a debt of about $168.00, of which he claims to have since paid $100.00, and claims that at the time he filed his answer, he only owed that firm about $68.00. The commissioner's report shows, that on the 1st day of March, 1876, he owed said firm of Massman & Co. $271.27. Afterwards, beside the $3,000.00 which his wife claims he had given to her, he paid (as we shall hereafter show) upon the property $1,500.00. The pleadings and proofs show, that the most he owed at the time the conveyance was made, was bout $218.00; and also that but little additional indebtedness was incurred by him for nearly a year afterwards, and the major part of it after that. Now does this state of things throw upon him the necessity of explaining the circumstances further to escape the conclusion that a

the time the conveyance was made, he procured it with the actual fraudulent intent to hinder, delay or defraud his creditors? Does it make such a *prima facie* case of fraudulent intent, as is conclusive evidence of such intent, not being explained by other facts and circumstances in the case? We think not. The defendant Brown was not indebted at that time, as far as the record discloses, to that degree of embarassment. It must be remembered that the deposition of Jacob B. Brown is not in the cause. The cause stands upon the bill and answers with replication thereto, the agreement filed, and the commissioner's report. From this state of the cause we cannot say, that enough is shown to *prima facie* fix upon Brown, at the time said deed was executed, an actual fraudulent intent to hinder, delay or defraud his creditors. But while the conveyance itself, which was a voluntary one, was not fraudulent in fact, did Jacob B. Brown in fraud of his creditors voluntarily divert his means from the payment of his debts, and invest them in said house and lot for the benefit of his wife; and if so, can these creditors charge said house and lot therewith? It is insisted in the argument, that Mrs. Brown from her own separate business paid $1,000.00 of the $1,500.00 that was invested in said house and lot. The only evidence of this fact in the cause is found in the answers of Jacob B. Brown and Emily his wife, and the answers being replied to, and that fact being put in issue, there is no proof thereof in the cause. In case of a purchase by a wife during coverture the burden is upon her to prove distinctly, that she paid for the thing purchased with funds that were not furnished by her husband.

Evidence that she purchased amounts to nothing unless it is accompanied by clear and full proof, that she paid for it with her own separate funds. In the absence of such proof, the presumption is that her husband furnished the means of payment. Bump. on Fraudulent Conveyance, 318 and cases there cited. And another fact in this cause which greatly strengthens

this presumption is, that the bill charges specifically that Mrs. Emily Brown had no separate estate, which is not denied in the answer; the averment in the answer, that she paid $1,000.00 of the purchase money " out of the profits of her own business," not amounting to such denial. The agreement of facts shows that for said purchase the single bills of Jacob B. Brown and Emily his wife were given all dated the 30th day of September, 1872, and that said bills were secured by deed of trust on the property executed by them; and that the single bills were paid as they severally fell due, or shortly afterwards. Then it must be taken as a fact, that Jacob B. Brown paid upon the property, after the conveyance was made and while the debts audited existed, the sum of $3,000.00 and its interest. It is well settled that improvements put upon the property, in fraud of creditors, can be followed by the creditors on the premises where they are put; and the realty can, in favor of the creditors, be charged with the value of such improvements. *Sexton* v. *Wheaton*, 8 Wheat., 229; *Lockhard & Ireland* v. *Beckley*, 10 W. Va., 87. It is very clear from the evidence in this case, that in fraud of his existing creditors Jacob B. Brown without consideration deemed valuable in law diverted more means from their legitimate purpose and placed them in that house and lot, than would have been sufficient to have paid all his debts as audited in the commissioner's report in this cause. With those means he ought to have paid his debts; and they are in favor of said creditors a charge upon said house and lot; and unless Mrs. Jacob B. Brown, who holds the fee simple in said property, will pay said debts, then the property must be subjected to the payment thereof.

It is also assigned as error, that the court should not have decreed a sale of the property, when it was manifest from the commissioner's report, that the property would have in four years rented for sufficient to pay the debts charged upon it. In the case of *Tennent's heirs* v. *Pattons*, 6 Leigh, 196 it was held by the court of ap-

18

peals of Virginia, Judge Carr dissenting, that "upon a bill by creditors of a decedent against his administrators and heirs to marshal assets, the court may decree a sale of the land descended to the heirs; but it is not bound, and ought not to decree such sale, if the rents and profits of the lands will satisfy the debts within a reasonable time, especially if the heirs be infants." In that case, Tucker, President, says: "But though the power of sale has been asserted and exercised in *England* on bills to marshal assets, and though it must be confessed that there is no such case in which a previous inquiry has been directed as to the annual value of the land, and its capacity to discharge the debt in a reasonable time, yet on the other hand I have found none in which a sale has been decreed, where it appeared that the rents and profits would discharge the debt very promptly. Unless such a case can be shown, I must rest upon those obvious principles, that courts of equity cannot give rights to parties which the law does not give them; that they cannot, even in the extension of the remedies of the creditor, be inattentive to what equity requires toward the debtor; and that in granting a favor to the first they will not wantonly sacrifice the fortunes of the latter. Where indeed it is a matter of right, the creditor must have it at whatever sacrifice to the debtor. But where he appeals to equity for its aid, he can only expect that aid so far as it will not work injustice and oppression. In assisting him the court will look with impartial eye to what is due to the debtor, and will mold its remedies, as far as is consistent with the creditors' rights, so as to prevent unnecessary loss to the owners of the inheritance. This is the true spirit of equity; it is the spirit of our statute law, which even in sales under mortgages authorizes a sale upon credit, and a consequent postponement of the recovery, for the purpose of preventing the ruinous sacrifices attendant upon the sales of real estate under the hammer. Of these sacrifices this case is an example. Nearly one half of a tract of land which

would rent for $400.00, has been sold out and out for
little more than $800.00.  Had such a case presented
itself to *Lord Hardwicke*, I cannot think he would have
directed a sale to the ruin of the infant heirs, where
within so short a period the debt might be raised from
the rents and profits.  While, therefore, I defer to the
authorities which have decreed a sale of the realty, on a
bill to marshal assets, I must presume, that in these
cases it did not appear, that the debts could be promptly
raised without any sacrifice on the part of the heirs.
Where that does not appear, where the debt cannot be
discharged out of the rents and profits within a reasona-
ble time, the precedents must be followed; but where
the contrary appears, we are without either reason or
precedent to bind us to such a course.  It may be ob-
jected, however, that the rule is too vague and indefinite,
which restricts the sale to cases where the debt cannot
be made in a reasonable time.  I do not think so.  What
is reasonable time, is matter of discretion of every days'
occurrence in courts of equity."  In the case of *Manns*
v. *Flinn's adm'r*, 10 Leigh, 93 it was held, that where
"an interlocutory decree directs a sale of lands to satisfy
a debt in a case where it might have been proper to de-
cree satisfaction out of the rents and profits, but this
was not a point controverted in the court below or in
any way brought to the notice of the court, and though
the party had ample opportunity to apply to the court
to alter the decree in that particular, he did not apply for
such alteration, the decree shall not be reversed for such
cause, but affirmed, and the cause remanded with direc-
tion to alter the decree, and direct satisfaction out of the
rents and profits, if such alteration be asked, and if the
debt can be satisfied out of the rents and profits within
a reasonable time."  In this case *Tennent's heirs* v. *Patton's*
was cited and approved; and as far as I have been able to
learn was never questioned, but regarded ever after-
wards in Virginia as settling the law on the subject.
In the two cases we have cited, the lands of decedents

were sold, but in the case of *McClung* v. *Beirne*, 10 Leigh, 394 the same doctrine was held to apply to the lands of a living defendant, and it seems to us for a stronger reason. In that case the court held that, "if none of the parties ask an inquiry to ascertain whether the rents and profits will pay the debt in a reasonable time, there may be a decree for the sale of the property." The court in a proper case would undoubtedly, as it had before done, have held the converse of the proposition to be true, "that if an inquiry had been asked to ascertain whether the rents and profits would pay the debts in a reasonable time, and it appeared from the report of the commissioner, or otherwise, that such rents and profits would in a reasonable time discharge the debts, that there should be no decree to sell the realty." In the last mentioned case Judge Tucker, who pronounced opinions in both the former cases cited, says: "The next error assigned is the failure to ascertain whether the rents and profits would not pay the debt in a reasonable time. To this it may be answered: 1. That the defendant not having asked the inquiry is presumed to have waived it—*Manns* v. *Flinn's adm'r*, reported *ante* p. 93. 2. That the price of the property ($200.00) is a a sufficient assurance that the rents of half of it would be inadequate even to pay the interest." It thus appears to have been the well established practice for many years in Virginia, that when a proceeding was pending in a chancery court to enforce a judgment lien upon real estate, if the debtor or others interested asked it, they were entitled to have the fact ascertained, whether the rents and profits of the real estate, against which the proceeding was had, would not discharge the lien in a reasonable time, and if such rents and profits would so discharge the lien, not to decree a sale of the land, but to rent it to pay the debt charged upon it. And this was the established practice in Virginia, when the Code of 1849 was adopted; and for the first time we there find the provision in section 9 of chapter 186, "If

1877.
August Term.
Rose & Co. et al.
v.
Brown et ux.

it appear to such court, that the rents and profits of the real estate subject to the lien will not satisfy the judgment in five years, the court may decree the said estate or any part thereof to be sold, and the proceeds applied to the discharge of the judgment." The effect of this provision was to take away from the courts the discretion of saying, what would be a reasonable time; and the statute fixed it at five years. Under that statute, if it appeared that the rents and profits of the estate would not discharge the lien in five years, it was made the duty of the court to order a sale of the realty; but if such rents and profits would discharge the lien within five years, then it was the duty of the court to refuse to decree a sale of the realty, and decree that it be rented. This same provision is in the Code of 1860, and was the law of West Virginia until the adoption of the Code in 1868, when the latter part of the section which we have quoted, was omitted leaving only the first clause of the section. "The lien of a judgment may always be enforced in a court of equity."

By the repealing act of the Code, chapter 166 section 1, the latter part of the section as it stood in the Code of 1860 was repealed. What was the effect of such repeal? Was it to declare, that in no case can a court of chancery while enforcing the lien of a judgment, decree that the real estate shall be rented to pay the judgment? that in every case a sale must be ordered? By the practice in Virginia, as it existed prior to the Code of 1849, while enforcing judgment liens on land, the courts uniformily held that it would be improper to decree the sale of real estate, when the debtor asked that it might be rented, and it appeared that the rents and profits of the estate would pay the lien in a reasonable time; and what was reasonable time was left to the sound legal discretion of the courts, which discretion was of course reviewable by the appellate court. If this was the practice of the chancery courts of Virginia, as we think it undoubtedly was, what was the effect of repealing the provision above referred to? It was to restore that practice.

When a statute changing the common law is repealed, the common law is restored to its former state. *Insurance Company of the Valley of Virginia* v. *Barley's adm'r.*, 16 Gratt., 363. We then as to the renting of real estate, where the rents and profits will pay the debts in a reasonable time, are governed by the established practice of Virginia, as it existed prior to the Code of 1849. And the courts in enforcing the lien of a judgment against real estate, when the debtor or others interested ask it, should in some way ascertain, whether the rents and profits of said estate will in a reasonable time discharge the liens upon it; and the judge is clothed with discretion to say whether such rents and profits will in a reasonable time, of which reasonable time he must judge, pay off and discharge the liens on the land; and if it will, it is his duty to direct a rental of the property rather than a sale. And the discretion so to be exercised is not an arbitrary one, but a sound discretion, in the interest of fairness and prudence toward all the parties interested, and is reviewable of course in the appellate court. There is nothing in the statutes of this State to prevent this; and a proper regard for the rights of the debtor, when not to the prejudice of the creditors, requires its exercise. And its proper exercise is as much enforcing the liens of judgments, as if sales of the realty were directed. There has been no decision of this Court since the repeal of the statute upon the effect therof; not regarding the opinion of the court in *Handley, et al.* v. *Sydenstricker adm'r*, 4 W. Va., 605, a *decision* of the question. A remark was made by the judge who pronounced the opinion of the court in *Pecks* v. *Chambers*, 8 W. Va., 210, which on first impression might considered in opposition to the views herein expressed; but properly understood it cannot be so construed. The question we are here considering was not discussed in that case; the question the judge was discussing was, whether it was necessary to exhaust the legal remedies to collect a debt against the personalty, before proceeding to enforce the

judgment lien against the real estate; and it was there, we think most properly, held that it was not. The remark referred to was this: "A court of equity may under the provisions of said eighth section sell lands of the judgment debtor to pay his judgment debts, whether the rents and profits of the lands of the debtor will pay the debt in five years or not."

This is true; there is now no law fixing the time within which the rents and profits of the real estate will pay the debts, before the chancellor is authorized to decree a sale of the property. It is now left to his discretion to say whether it may be done in a reasonable time, of which he must judge; and if he ascertains that the rents and profits of the real estate will pay the lien charged upon it in such reasonable time, it is his duty to refuse to decree a sale.

Many matters are left to the discretion of the chancellor; and why not this? In many cases great hardship may result to the debtor by decreeing a sale rather than a rental of his property, where the rents and profits would discharge the debts in a reasonable time; when no hardship would result to the creditor by renting the property and paying the debts in that way. The chancellor has a discretion in fixing the time upon which the sale may be made, and in some instances it may be almost if not quite as long as it would take to raise the amounts from the rents and profits, in cases where the property is considerable, and the debts small. Why then should he not have the discretion to decree a rental of the property in such cases? We see no reason or authority why he should not. But as this is a privilege accorded to the debtor, or the party whose lands are charged with debts and others interested, it must be exercised by them in the court below; and the decree must show that they asked a rental of the property and it was refused, before the decree for that reason will be reviewed in the appellate court. The decree in this cause does not show that the defendants asked that the property be rented, and there-

fore the court was not called upon to say, whether in a reasonable time the rents and profits of the real estate will pay the debts charged upon it. This discretion must first be exercised by the chancellor below, before this Court will review the decree of the court below, and upon such review will not reverse it, unless it appear that the court erred in the exercise of that discretion. But as the decree appealed from is an interlocutory decree, upon the authority of *Manns* v. *Flinn's adm'r, supra,* when the cause goes back to the court below, the defendants may ask the court to ascertain or pass judgment on the question, whether the rents and profits of the real estate will not pay the debts charged upon it in a reasonable time, and if so ascertained or adjudged that the debts may be so discharged, that the property be rented instead of sold.

It is also objected, that the decree should have given a day to the debtor to redeem the property by paying the amounts charged upon it. It was manifest error for the court not to do so, as has been repeatedly held by this Court.

But it is contended in argument, that the day was given by the provision in the decree that the commissioners should not advertise said property for sale before the 1st day of September thereafter. This does not give a day to redeem. There was nothing to prevent the commissioners from selling, though the defendants had offered to pay the debts in full and tendered the money.

It was improper to confine the sale to the " brick store " house without the consent of all the parties to the suit. There would have been nothing wrong in offering that first, if a sale had been proper, but it should not have been confined to that; as if it had failed to bring sufficient to discharge the debts, it would have been necessary to direct more of the real estate to be sold, thus unnecessarily harassing the parties with costs.

For the foregoing reasons, I am of opinion that the decrees of the circuit court of Jefferson county, rendered

in this cause on the 21st day of April, 1876 and on the 25th day of April, 1876 respectively, be reversed with costs to the appellants; and this cause is remanded to the circuit court of Jefferson county for further proceedings to be had therein according to the principles of this opinion and the rules and practice governing courts of equity, with instructions to said court to provide, if it be asked, for the payment of the debts charged on the real estate out of the rents and profits of said property, if adequate thereto in a reasonable time; and if not, then to decree a sale of so much of said real property as will discharge the liens charged thereon.

DECREES REVERSED and cause remanded.