# SPRING-SPECIAL TERM.

## CHARLESTON.

### BURT *v.* TIMMONS *et al.*

Submitted January 27, 1887.—Decided March 26, 1887.

1. FRAUDULENT CONVEYANCE—CREDITOR AND DEBTOR.

The maxim—" Fraud must be proven and is never to be presumed,"—is true, only when understood as affirming, that a contract or conduct apparently honest and lawful must be regarded as such, until it is shown to be otherwise by evidence either positive or circumstantial; but fraud may be inferred from facts calculated to establish it; and fraud should be so inferred, when the facts and circumstances are such, as to lead a reasonable man to the conclusion, that an attempt has been made to withdraw the property of a debtor from the reach of his creditors with the intent to prevent them from recovering their just debts; and, if *prima facie* such fraudulent intent be thus established, it must be regarded as conclusively established, unless it is rebutted by the facts and circumstances, which are proven. (p. 450.)

2. FRAUDULENT CONVEYANCE—PROOF.

A transaction between father and child, husband and wife, brother and sister or between others, between whom there exists a natural and strong motive to provide for a dependent at the expense of honest creditors, if such transaction be impeached as fraudulent, may be shown to be fraudulent by less proof, and the party claiming the benefit of such transaction is held to a fuller and stricter proof of its justice and of the fairness of the transaction, after it is shown to be *prima facie* fraudulent, than would be required, if the transaction was between strangers. (p. 452.)

3. FRAUDULENT CONVEYANCE—MARRIED WOMAN—BURDEN OF PROOF.

When a wife purchases land or other property, the burden is upon her to prove distinctly, that she paid for the land or other property with funds not furnished by her husband. Evidence, that she purchased, amounts to nothing, unless it is accompanied with clear and full proof, that she paid for it with funds furnished by some one other than her husband. In the absence of such proof the presumption is, that her husband furnished her with the means of payment. (p. 453.)

56

| 29 | 441 |
| 29 | 622 |
| 30 | 563 |
| 32 | 213 |
| 32 | 240 |
| 32 | 417 |
| 32 | 452 |
| 33 | 402 |
| 29 | 441 |
| 34 | 185 |
| 34 | 446 |
| 29 | 441 |
| 36 | 15 |
| 29 | 441 |
| 37 | 13 |
| 37 | 374 |
| 37 | 384 |
| 37 | 406 |
| 29 | 441 |
| 38 | 485 |
| 29 | 441 |
| 41 | 260 |
| 41 | 386 |
| 29 | 411 |
| 44 | 560 |
| 29 | 441 |
| 46 | 622 |
| 29 | 441 |
| 47 | 718 |
| 47 | 719 |
| 47 | 723 |
| 29 | 441 |
| 48 | 420 |
| 29 | 441 |
| 52 | 50 |
| 52 | 218 |
| 52 | 219 |
| 29 | 441 |
| 53 | 410 |
| 29 | 441 |
| 54 | 460 |
| 54 | 464 |
| 54 | 467 |
| 29 | 441 |
| 55 | 496 |
| 55 | 505 |
| 29 | 441 |
| 57 | 486 |
| 29 | 441 |
| f62 | 81 |
| 62 | 485 |

4. IMPROVEMENTS—FRAUD—MARRIED WOMAN.

Improvements put upon real property of the wife in fraud of the creditors of the husband can be followed by his creditors to the premises, where they are put; and the realty can in favor of such creditors be charged to the extent of the value of such improvments. (p. 453.)

5. FRAUDULENT CONVEYANCE—PROOF.

A transfer of property either directly or indirectly by an insolvent husband to his wife is justly regarded with suspicion; and unless it clearly appears to have been entirely free from intent to withdraw the property from the husband's creditors, or the presumption of fraud be overcome by satisfactory affirmative proof, it will not be sustained. p. 453.)

6. FRAUDULENT CONVEYANCE—MARRIED WOMAN.

A deed to a wife, though ever so fraudulent as to creditors of the husband, who furnished the money, wherewith the property was purchased, is nevertheless valid and binding on the grantor and on the husband. (p. 461.)

7. FRAUDULENT CONVEYANCE—CREDITORS—JUDICIAL SALE.

When such a deed is made to a wife, and the husband advances the money to pay for the land and to put improvements on it, and a creditor of the husband brings a suit to set aside such a deed as to him and to subject the land to the payment of the debt due from said husband to him, it is not required by the statute nor by the general rule on the subject, that all the creditors of the husband should be convened, and their debts reported, or that it should be ascertained, whether the rents will pay off his debts in five years or in a reasonable time, before there can be a decree for the sale of said land. (p. 461.)

Statement of the case by GREEN, JUDGE :

This was a chancery-suit brought in May, 1883, in the Circuit Court of Pleasants county by William Burt to set aside as fraudulent a certain deed made on April 5, 1880, by A. C. Imlay and wife to his sister, Josephine E. Timmons, and to subject the lot thereby conveyed to the satisfaction of a judgment of the plaintiff recovered in the County Court of said county against B. B. Timmons, the husband of Josephine E. Timmons, for $173.67 with interest thereon from September 9, 1878, till paid and costs, which judgment was duly docketed in the clerk's office of said county on January 6, 1882. The consideration named in the deed was $110.00 cash. Execution was issued promptly on the judgment and

was returned—" no property found."—The bill alleges these facts and proves them by exhibits filed therewith. The bill further alleges, that this $110.00 was wholly paid by B. B. Timmons out of his own estate, and that no part of it was paid by his wife, Josephine E. Timmons, to whom the land was fraudulently conveyed in order to defraud the creditors of her husband; and the bill prays, that B. B. Timmons and his wife, Josephine E. Timmons, and her brother A. C. Imlay may be made defendants and be required to answer these allegations and especially to state, what separate estate, if any, Josephine E. Timmons owned; that said conveyance be declared fraudulent, and said land be sold to pay the plaintiff's judgment-lien; and for general relief.

The defendants, B. B. Timmons and Josephine E. Timmons, on June 11, 1883, filed their joint answer, in which they deny the allegation, that B. B. Timmons either purchased or paid for the land in whole or in part. They say:—" The same was paid for by Josephine E. Timmons out of some money she then had of her own, but the greater part of said sum was paid by her father and brother for her; that afterwards her father, who is a boat-builder and carpenter built her a dwelling-house on said lot; and the material used in the construction of said house was principally paid for by her father and brothers, who built said house for her; and not any part of said house or lot was paid for out of the estate of the defendant, B. B. Timmons. " There is no allegation or statement in this answer, that Josephine E. Timmons owned any other separate estate. This answer also stated, that B. B. Timmons had paid to the plaintiff's attorney at various times $113.50 on this judgment, for which he took receipts stated in this answer to be filed with it, but which in fact were not so filed. This answer was sworn to by B. B. Timmons only and was replied to generally. Numerous depositions were taken by the parties.

In addition to the undisputed facts proven by the exhibits filed with the bill it was proven, that I. T. Imlay was the father of Josephine Timmons and was sixty years old, when the deed was made to her;—that he lived in St. Mary's, Pleasants county, West Virginia;—that his son, A. C. Imlay, the grantor in said deed, lived in the same village, being

married;—that the father and all his other children lived together in the same house;—that the family so living together consisted of the father, a single daughter, probably who had been and perhaps was then teaching school, two sons and Josephine Timmons, who had intermarried with the defendant, B. B. Timmons;—that said Timmons was carrying on a mercantile business in partnership with one Shoefelt in Volcano in the adjoining county of Wood;—that he visited the family in St. Mary's every two or three months;—that the family had no income except that derived from the day-labor of the father and the two sons, all of whom were rough carpenters, and perhaps from the school-teaching of the daughter;—that they had accumulated but little money, which was invested in the house, in which they lived;—that the money so accumulated and invested was earned by the younger brother and the sister, who was teaching school;— that the married sister, Josephine, had no separate estate;— that the married brother, A. C. Imlay, who made the deed to Josephine, was a shoe-maker and had accumulated some property;—that very shortly after this lot in St. Mary's was conveyed to Josephine, a house was built upon it worth about $1,000.00;—that much the larger part of the materials, which were used in building the house, were unquestionably purchased by Josephine's husband out of his own funds and with money furnished by him.

· This is unquestionable, though Timmons denied, that he furnished any of the material, and in his deposition states, that his wife refunded to him all the money, he had spent in buying materials for the house, though he does not state, where she got this money. Neither her father nor either of her two brothers, whose depositions were taken, pretend, that they gave her any money to repay her husband for the money, which he expended for the materials of which the house was constructed; nor do they pretend, that she had any separate estate, from which this money came, or that any one else gave her the money. Her own deposition was not taken. Her married brother, A. C. Imlay, says:—" For the bulk of the lumber, which went into this house, she gave me the money, and I bought about $150.00 of lumber for her; but I do not know, where she got this money. I

bought this lumber of Jones & Haines and paid them for it by making and repairing boots and shoes."—On cross-examination he says, that the amount of timber he so bought was $104.00, and he bought it of Jones & Haines, and she paid him for it. Jones in his deposition says, that Imlay bought this $104.00 of lumber of their firm and paid them for it, but says nothing about its being paid for by shoemaking. The inference from what he says is, that it was paid for in money, which seems far more probable. He says, he thinks, this was in 1879.

Her father testifies, that he and his oldest son bought the bricks for the chimney of the house, and his youngest son furnished 1,000 shingles. The bricks cost $13.50. He says, he furnished some of the lumber, but could not say how much. On cross examination he was asked whether all the materials, which he furnished, amounted to $25.00 in value. He answered, that he could not say. It is obvious, that he did not furnish as much as this. He says, that what material he did buy, was bought with his own money and given to his daughter.

I. M. Imlay, her brother, testifies, that he bought three trees and gave his sister one of them, which made a thousand shingles, and that he bought a thousand bricks, which went into the house, and furnished considerable lumber, what it was, he does not state. He says, he gave these materials to his sister and kept no account of what they were or of their value, but he thinks they were worth $50.00.

Taking as true the statements of her father and brothers, it is obvious, that all the materials given to her were worth less than $100.00. If any other material than that given by her husband was given to her, its value was probably less than $50.00.

On the other hand it is proven, that B. B. Timmons, while individually he had no property, was in partnership with one Shoefelt in the grocery business in Volcano. What was the nature of his interest in the partnership does not appear; but in his deposition he states, that, at the time he purchased a considerable amount of lumber of the Parkersburg Mill Co., he had Shoefelt's notes to the amount of $521.15,

and he found, he could trade one of these notes for material for this house, and he did so. His wife, he says, paid the amount back to him; but, when she did so, or where she got the money, he does not state.

One of the members of the Mill Co. states, that they furnished Timmons for his house in St. Mary's dressed flooring, which was shipped by his direction to St. Mary's. "The amount furnished was $197.08 between July 4, 1880, and November 11, 1880; and from May 21, 1881, to September 14, 1881, there was more lumber furnished for finishing stairway, &c., amounting to $56.16; and on September 29, 1881, $9.00 worth was furnished him. It was ordered by him and paid for as follows: $107.00 cash was paid July 6, 1880, by B. B. Timmons, and the balance of the $197.08 was settled by his note of January 5, 1881. This note was not paid, when it became due, and was renewed, and finally they took A. Shoefeldt's note of date May 10, 1881, for $95.00, and on September 3, 1881, Timmons paid in cash $11.50, and on September 15, he gave his own note for the balance, $41.71 in settlement of the subsequent accounts; and on this last note he paid $20.00 cash on November 11, 1881, and on April 11, 1882, they made a final settlement with him, the balance then due being $33.50, for which he gave his note, which with the interest thereon was still due and unpaid."

Of this $262.25 of materials for this house bought of the Parkersburg Mill Co. by Timmons and paid for by him their books show, that $115.65 was charged to Mrs. B. B. Timmons and the balance to him. He also purchased of Jenkins in Parkersburg the lime, plaster, glass and sash for the house. Jenkins testifies, that B. B. Timmons, who was the only person, he knew or ever heard of in the purchase of these materials, paid him for them from time to time except $311.65, for which he gave his note, which has not been paid.

In reference to the labor in the building of this house according to the testimony of Mrs. Timmons's father and brothers, corroborated to some extent by other witnesses, they did a very considerable part of it. They testify, that their labor was a gift to her, and that they made no charge for it; and though asked to estimate the value of their labor they say, that they are unable to make any estimate of it,

as they kept no account of it, except one of her brothers, who says:—" I am satisfied, if I had kept a strict account at liberal wages, it would have amounted to $50.00 or $75.00." The father states in some detail the work, he did. He superintended the work and from his statement seems to have done more labor than any one else; but he says, he can put no estimate on the value of the work done by him. On the other hand there were a number of other persons, who were at different times engaged in the work on the house, a portion of whose wages was from time to time paid to them by the members of the family, the father and the brothers, who told them, that the money was sent to them by her, but they did not state, where she got the same. Sometimes these wages were paid by B. B. Timmons. Eight men are mentioned as having worked on the house; but the depositions of only two of them were taken by either party. One of them, Houser, testifies, that his work amounted to $75.00 or $80.00;—that he made his contract with B. B. Timmons, who said to him:—" We are building a house and want to make a stairway up it; "—that he told Mrs. Timmons, that it would cost $33.00 to build the stairway, and that a short time afterwards.—" He said, he guessed I could go ahead with the work. I asked him, if Mrs. Timmons was at home, he said no, but I could go and see her, and she told me, she had written to her husband, and he said to go ahead with the work." Money was paid him from time to time by the father or one of the brothers, who generally said, she sent it; and when all the work was finished, they wanted him to give her a receipt for all the money, which had been paid him. B. B. Timmons himself paid $15.00 of this money at one time, and also furnished him in part payment $15.80 in groceries, which he bought in Parkersburg, as the bill on its face shows, it being made out against B. B. Timmons;—that he knew of no means, which Mrs. Timmons had.

The other workman did some hauling. He only says:—" I got a portion of my drawing bill from Mrs. B. B. Timmons. I got no money from B. B. Timmons himself." He did not know, where the money, she paid him, came from. He knew of no property or estate, which she owned.

The evidence with reference to the amount or value of

the work done by these men, with the exception of Houser, is very vague; and the way, in which they were paid, is but vaguely shown. But it does appear, that neither Mrs. Timmons's father nor brothers paid these workmen out of their own money; they were paid by her personally or through her father or brothers or directly by B. B. Timmons. It is not proven where she got the money, with which she paid them; but presumably she must have got it, from her husband, as it is not claimed, that she had a separate estate or earned any money. She was living with her father, and neither he nor her brothers say, they gave her any money, or that she had any income or estate, out of which she could have got the money. Her father and brothers probably did most of the work on the house; but this is not very satisfactorily proven. With reference to the lot, for which she got a deed from her brother, A. C. Imlay, he testifies, that she paid him cash $110.00. He did not know, where she got the money, and did not ask her. She had before that no separate property, that he knew of. I. M. Imlay, another brother, living with her at her father's, says:—" I paid her this $110.00 in money, which I had got by working; and her husband did not have any right or interest in the money, that I know of. She wanted it to buy this lot, on which the house was built. " This is all, he says on the subject. He does not say, on what account he paid his sister this $110.00; and the inference to be drawn from his statement is, that he intended it as a present to her, though he does not so state. Her husband testifies, that he did not know anything about this matter till afterwards, and that he did not hear of it, till he came home. He says he could not tell, where she got the money, which she repaid to him for the materials, he had bought, and labor he had paid for;—" her brothers could tell you, I suppose. " But in their depositions they do not tell, where she got this or any other money except the $110.00, which she paid for the lot. B. B. Timmons in his deposition states, that he paid to the plaintiff's attorney on his judgment between December 31, 1881, and September 7, 1883, $109.70, for which he files with his deposition his five receipts. He further claims, that he paid this attorney $12.00 more on this judgment, but does not state

when; and as one of the receipts, which he files, is for
$12.00 dated July 13, 1882, I presume, that is the $12.00 of
which he speaks, especially as he did not in his answer,
sworn to by him, claim to have paid more than $113.50, for
all of which, he then stated, he took receipts.

This being the substance of the evidence in this cause,
the Circuit Court on June 16, 1886, rendered the following
decree:

"This cause came on this day to be heard upon the bill
and the exhibits filed therewith, upon the answer of B. B.
Timmons and Josephine Timmons, and general replication
to said answers, upon the bill taken for confessed as to the
said A. C. Imlay and regularly set for hearing as to him at
rules, upon the depositions of both plaintiff and defendants
filed in the papers in this cause, and was argued by counsel.
Upon consideration whereof, the court is of opinion that
the plaintiff is not entitled to the relief prayed therefor; it
is therefore considered by the court that the bill of the com-
plainant be and the same is hereby dismissed, and that the
complainant do pay the defendants their costs by them in
this defence here expended, and leave is granted defendants
to sue out execution therefor."

From this decree the plaintiff has obtained an appeal and
*supersedeas.*

*Hutchinson & Johnson* for appellant.

No appearance for appellee.

Green, Judge:

The question, upon which the decision in this case must
depend, is largely a question of fact. And as the conclusion,
I have reached, is the reverse of that of the Circuit Court, I
have deemed it proper in the statement of the case to give
the facts and the evidence, which is contradictory, at con-
siderable length. The undisputed facts of the case are, that
on September 10, 1878, the plaintiff recovered against the
defendant, B. B. Timmons, a judgment for $173.67 with in-
terest thereon from September 9, 1878, and costs amounting
to $10.15, on which judgment execution was promptly issued
and returned—" No property found."—Not a cent was paid on

this judgment till after the institution of this suit. About two and a half years thereafter on April 5, 1880, A. C. Imlay conveyed to his sister, Josephine E. Timmons, wife of B. B. Timmons, and one of the defendants in this suit, a small building-lot in the town of St. Mary's in Pleasants county, West Virginia, containing about one seventh of an acre, to build a house upon. The consideration named in this deed was $110.00 cash. Almost immediately after this conveyance was made a dwelling-house worth about $1,000.00 was put up on the lot; and Timmons and his wife lived in it. This suit was brought not long afterwards to set aside the deed and to subject the house and lot to the payment of the aforesaid judgment, on the ground, that the deed was fraudulent and void because made to hinder, delay and defraud the creditors of Timmons, the plaintiff asserting and attempting to prove, that the lot was purchased with and the house built out of funds furnished by the said Timmons. This was denied by the defendants; and they endeavored to prove, that not a cent of B. B. Timmons's money was used either to buy the lot or build the house. The court below so held and dismissed the plaintiff's bill and rendered a decree against him for costs. This is the decree appealed from by the plaintiff.

Before considering this question upon the evidence I will state a few legal propositions, which will aid us in reaching a correct conclusion, as to whether or not the defendants were guilty of a fraud in obtaining the conveyance of this lot to be made to the wife and in the building of the house upon it.

First. A fraud upon creditors consists in the intention to prevent them from recovering their just debts by an act, which withdraws the property of the debtor from their reach. (*McKibbin* v. *Martin*, 64 Pa. St. 352; *Ala. Ins. Co.* v. *Pettway*, 24 Ala. 544). It is often said, that fraud must be proved and is never to be presumed. This is true, only when understood as affirming, that a contract or conduct apparently honest and lawful must be treated as such, until it is shown to be otherwise by evidence either positive or circumstantial; but fraud may be inferred from facts calculated to establish it; and fraud should be so inferred, when

the facts and circumstances are such as to lead a reasonable man to the conclusion, that an attempt has been made to withdraw the property of the debtor from the reach of his creditors with the intent to prevent them from recovering their just debts; and, if *prima facie* such fraudulent attempt is thus established, it may be regarded as conclusively established, unless it is rebutted by facts and circumstances, which are proven. (*Martin* v. *Rexroad*, 15 W. Va. 512; *Knight* v. *Capito*, 23 W. Va. 644; *Kane* v. *Weigly*, 22 Pa. St. 179.) That this proposition may be clearly understood, I will cite some remarks of Black, C. J., in the case last above cited. On page 183 he says:

" It is said, fraud must be proven and is never to be presumed. This proposition can be admitted only in a qualified and limited sense. But is often urged at the bar, and sometimes assented to by judges, as if it were a fundamental maxim of the law universally true, incapable of modification and open to no exception; whereas it has scarcely extent enough to give it the dignity of a general rule, and as far as it does go it is based on a principle, which has no more application to frauds than to any other subject of judicial inquiry. It amounts but to this : That a contract honest and fair on its face must be treated as such, until it is shown to be otherwise by evidence of some kind positive or circumstantial. It is not true that fraud can never be presumed. Presumptions are of two kinds, *legal* and *natural*. Allegations of fraud are sometimes supported by one and sometimes by the other, and are seldom, almost never, sustained by that direct and plenary proof, which excludes all presumption. * * * * * When creditors are about to be cheated, it is very uncommon for the perpetrators to proclaim their purpose and call in witnesses to see it done. A resort to presumptive evidence therefore becomes absolutely necessary to protect the rights of honest men from this as from other invasions. Upon such evidence the highest criminal punishments are inflicted, and the most important rights of property constantly determined. Fraud in the transfer of goods or lands may be shown by the same amount of proof, which would establish any other fact in its own nature as likely to exist. In any case the number and cogency of the

circumstances, from which guilt is to be inferred, are pro-
portioned to the original improbability of the offence. The
frequency of fraud upon creditors, the supposed difficulty of
detection, the powerful motives, which impel an insolvent
man to conceive it and the plausible casuistry with
which it is sometimes reconciled to the consciences even
of persons, whose previous lives have been without re-
proach; these are the considerations, which prevent us
from classing it among the grossly improbable viola-
tions of moral duty; and therefore we often presume it
from facts, which may seem slight. Besides, when a man,
who knows himself unable to pay his debts, disposes of his
property for a just purpose, he can easily make and produce
the clearest evidence of its fairness. * * * * It is no
hardship upon an honest man to require a reasonable ex-
planation of every suspicious circumstance; and rogues
are not entitled to a veto upon the means employed for their
detection."

These remarks seem to me to be just and clear; and they
explain the true meaning and scope of this first legal propos-
ition.

Second—Transactions between father and child, brother
and sister, husband and wife or between others, between
whom there exists a natural and strong motives to provide
for a dependent at the expense of honest creditors, if such
transaction is impeached as fraudulent, may be shown to be
fraudulent by less proof, and the party claiming the benefit
of such a transaction is held to a fuller and stricter proof of
its justice and fairness, after it has been shown to be *prima
facie* fraudulent, than would be required, if the transaction
was between strangers. (*Knight* v. *Capito*, 23 W. Va. 644,
645; Bump on Fraud. Conv. 3d Ed. 57, 58, 59 and authorities
cited.) This proposition seems to be a necessary conclusion
from the opinion of Judge Black in *Kaine* v. *Weigly*, above
quoted. For, as stated by him, "when a fraud is sought to be es-
tablished in any case, the number and cogency of the circum-
stances, from which guilt is to be inferred, are proportioned
to the original improbability of the offence;" and of course
when the transaction is between near relatives or connec-
tions, as father and child, or husband and wife, there is a

strong motive naturally to provide at the expense of honest creditors, where the protector is embarrassed or insolvent, and of course the improbability of a fraud on creditors for this purpose is diminished, and the evidence necessary to establish it is correspondingly diminished.

Third.—When a wife purchases land or other property, the burden is upon her to prove distinctly, that she paid therefor with funds not furnished by her husband. Evidence, that she purchased, amounts to nothing, unless it is accompanied with clear and full proof, that she paid for it with funds furnished by some one other than her husband. In the absence of such proof the presumption is, that her husband furnished the means of payment. (*Stockdale* v. *Harris*, 23 W. Va. 499; *McMasters* v. *Edgerton*, 22 W. Va. 673; *Rose* v. *Brown*, 11 W. Va. 122; *Core* v. *Cunningham*, 27 W. Va. 206; *Herzog* v. *Weiler*, 24 W. Va. 203.)

Fourth.—Improvements put upon real property of the wife in fraud of creditors of the husband can be followed by them on to the premises where they are put; and the realty can in favor of such creditors be charged to the extent of the value of such improvements. (*Rose* v. *Brown*, 11 W. Va. 137; *Core* v. *Cunningham*, 27 W. Va. 09).

Fifth.—A transfer of property either directly or indirectly by an insolvent husband to his wife is justly regarded with suspicion; and unless it clearly appear to have been entirely free from wrong intent to withdraw the property from the husband's creditors, or the presumption of fraud be overcome by satisfactory affirmative proof, it will not be sustained.

Let us now consider the evidence in connection with these well settled principles of law and determine, whether the house and lot should have been subjected to the payment of the balance due on the plaintiff's judgment against B. B. Timmons. When this lot was conveyed to his wife, and while the house was being built, he was carrying on a grocery business in an adjoining county in partnership with another person. He owned individually no visible property. All that he was worth was his interest in the said partnership and such debts as might be due, he having been carrying on the business for a short time prior to the formation of the

partnership. This partner owed Timmons $521.15 for which Timmons held his note given probably, at the time the partnership was formed. What other debts were due him does not appear, probably very few. He was evidently a man of small means, the execution on the plaintiff's judgment having been returned " no property found. " His wife lived at her father's in St. Mary's, and he visited her every two or three months. Her father's family consisted of two sons, herself and perhaps an adult unmarried daughter, who had been or perhaps was then teaching school. This family was poor, having no visible property except the house, in which they lived, and were supported by the daily labor of the father and the two sons, they being all rough carpenters. Timmons's wife had no separate estate, and her husband being a poor man, she lived with her father. In 1879, it was concluded to break up this arrangement and that her husband should purchase a small lot in the same village and build a house on it; and, as he was in debt, it was concluded that the deed for the lot should be made to his wife. Accordingly a part of the material for the house was purchased in 1879 of Jones & Haines. This lumber cost $104.00; and her brother, A. C. Imlay, who was married and lived in the same village, acted as agent in making the purchase of this lumber, the money, he says having been given to him by Timmons's wife afterwards, or perhaps it might have been given to him as such agent before; but it is entirely clear from our third legal proposition above stated, that the money, with which this lumber was bought, must be regarded as furnished by her husband, neither her father nor either of her brothers nor any other person pretending to have given it to her. Some time afterwards, in April, 1880, her married brother conveyed this lot to her for $110.00 in cash, as the deed states, and as he testifies. This $110.00, another brother testifies, was given to her by himself out of money, which he had earned; and her husband testifies, that he knew nothing of this till afterwards, when he visited his wife. These statements are, it seems to me, clearly untrue. A. C. Imlay testifies, " that he supposed it was her money, but he did not ask her, and he did not know where she got the money. " And he says the same about

the money, she gave him ($104.00) to buy lumber with or to repay him for lumber which he had bought. Can it be believed, that thus receiving from his sister in a short time more than $200.00, when he knew she had no separate estate and was doing nothing but was living with her father, who was a poor man and, as he says himself, had nothing to give her, he made no enquiry, as to where she got the money, unless he knew, that she received it from her husband, who was engaged in business as a partner of Shoefeldt? Can it be believed, that her brothers, who also lived in their father's house and helped support the family by days'. labor, gave her this $110.00? He testifies, that he gave it to her to buy this lot with out of his earnings as a day-laborer; but he does not tell us, why he gave it to her, whether he owed it to her or not. All he says is :—" He did not know, that her husband had any right or interest in this money, which he paid to his wife." It seems to me incredible, that a man, who probably as a day-laborer never had $110.00 at one time, should give, as I suppose he means to be understood, to his married sister this amount of money at one time to buy a lot, upon which to build a house, when her husband was engaged in business and was far more able to buy a lot and build a house than he was. The truth, I presume, is, that the husband, B. B. Timmons, sent him the money for his wife and he handed it over to her to buy this lot, if it be true, that she paid for it.

The third legal proposition laid down above requires, that the presumption in such a case is, that the money was furnished by her husband; and the presumption can be rebutted only by clear and full proof, that she paid for it with funds furnished by some one other than her husband. I do not deem the testimony of her brother, that he furnished her the money, as "clear and full proof." On the contrary it seems to me very unsatisfactory proof; especially when it appears, that she is not called as a witness to prove this fact, and that it clearly contradicts her own statement in her answer, "that this lot was paid for by herself out of some money she then had, but the greater part of said sum was paid by her father and brother for her." The depositions of her father and of the brother referred to were taken; and

they contradict this statement in her answer. It would seem, that, after the answer was filed, the story about this $110.00 was changed, and the pretence was set up by her brother, A. C. Imlay, that she paid in cash the whole of this $110.00 at one time, the money having been given to her by another brother for that purpose. The statements in reference to this money made in the answer and those made in the depositions taken by the defence are all obviously false, and these being false, the legal presumption in the absence of clear and full proof to the contrary, that her husband furnished her this money, must be regarded as the real truth.

Of course the statement in her husband's deposition, that he never heard of this transaction and did not know about this intended purchase, till he came home afterwards, is utterly false. Lumber to build a house on this lot had been bought with money furnished by him months before this deed was made to his wife. There is not even a pretence, that the $104.00, with which that lumber was bought, was furnished by any one else. Her father and brother in their depositions do not pretend, that they or any one of them ever gave her any money except the $110.00, with which it is pretended she bought the lot. They do say, that they gave her their labor in the building of the house; and that is doubtless true. But it is clearly proven, that her husband paid for a part of the labor on the house; and as she had no money or income, and her father and brothers gave her no money, of course her husband furnished her with all the money, which she in person or through her father or brothers paid to other workmen for labor on the house.

While her father and brothers in their depositions state, that they gave her a small part of the materials used in building the house, it is clearly proven, that the great mass of the materials was bought with money furnished by her husband. Besides the $104.00 worth of lumber bought of Jones & Haines before the building was commenced her husband bought of the Parkersburg Mill Co. lumber and other materials for the house to the amount of $262.25, and of Jenkins all of the lime, plaster, glass and sash used in building the house. What they cost does not appear, but

after paying for most of the articles he still owed $34.00 for which he gave his note. His purchases of materials alone are thus proven to have exceeded $400.00, while the money paid by him or out of his funds to laborers on the house is clearly shown to have exceeded $100.00. There was there- fore certainly more than $500.00 of B. B. Timmons's money invested in the house alone. It is true, that in his deposi- tion he testifies, that his wife afterwards repaid him for this outlay, and that none of his estate was really used in the construction of the house ; but he says, he could not tell, where she got the money to repay him, but supposes her brothers could tell. Their depositions were taken; but they did not know where this money came from; and she, who would certainly have known, fails to testify at all. This statement of her husband's is obviously a base falsehood. She never repaid to him one cent of the money, he had in- vested in the building of this house; for she never had a cent of her own, with which to repay him. By our fourth legal proposition certainly the plaintiff in this cause had a perfect right to charge this house and lot with the payment of his judgment against B. B. Timmons to the extent of at least $500.00, the amount, which he certainly invested in the house. I do not doubt, that he invested more than $700.00 ; but, as the plaintiff's judgment now unpaid is much less than $500.00, it is unnecessary to ascertain more accurately the amount, which he really invested in the house and lot; as the amount already ascertained is amply suffi- cient to pay off the balance of the plaintiff's judgment with interest and costs.

The next enquiry is : What was the true balance due on the plaintiff's judgment, when the court below rendered its decree dismissing the plaintiff's bill on June 16, 1886 ? Timmons in his deposition states, that he had paid on this judgment $109.70, for which he took the receipts of the plaintiff's attorney, which he filed with his deposition. There were five such receipts, by which the payments appear to have been made between December 3, 1881, and January 13, 1882. It is true, these receipts in some cases do not clearly identify the debt, on which the payment was made. One of them for instance states that the payment was made

on a judgment of *Wm. Burt* v. *B. B. Timmons*, in the County Court of Pleasants county; and another states, that the payment was made on a judgment of *Burt Sons & Co.* v. *B. B. Timmons;* but, as they are all signed by the attorney, who filed the bill for the plaintiff in this cause, and, as it is not shown, that William Burt had any other judgment against B. B. Timmons, I am opinion, that all those receipts should be allowed as credits on this judgment as of their respective dates. Timmons in his deposition states, that he paid in addition to the sums named in the said receipts $12.00 on this judgment, for which he never took a receipt. He gives no reason for not taking such receipt; and, as one of the receipts produced is for $12.00, I infer, that this is the payment, for which, he says, he took no receipt; and this inference is, I think, made almost conclusive by his statement in his answer sworn to by him in June, 1883, that he paid the plaintiff's attorney for W. Burt at various times the sum of $113.50, for which he took receipts. There being then in less than a year after the last payment was made no claim of any payment, for which he took no receipt, when it is considered that he has shown himself capable of testifying to gross falsehoods when tempted by his interests, it is plain, that no credit should be given him on this judgment except these five receipts. Allowing these credits as of the respective dates on the receipts and calculating the interest on the judgment as stated on its face, the balance due on it on June 16, 1886, when the decree dismissing the plaintiff's bill was rendered, was $168.48, the payments being little more than enough to meet the costs recovered in the common-law-suit and accrued interest on the judgment.

Instead therefore of dismissing the bill the Circuit Court should in its decree have established this as the amount due on the plaintiff's debt and should have declared it a charge upon the house and lot and should have provided for its payment out of the same. I have much difficulty in understanding how any other conclusion could have been reached.

Judge Snyder in *Core* v. *Cunningham*, 27 W. Va. 209, says :—" From the repeated decisions of this Court it seems to me, that suitors and counsel should have long since be-

come aware of the fact, that it requires a great deal more than the raising of a simple doubt or probability to establish the right of a wife to property, which she seeks to withhold from the creditors of an insolvent husband. (*Lockhard* v. *Beckley*, 10 W. Va. 87; *Hunter* v. *Hunter*, Id. 321; *Rose* v. *Brown*, 11 W. Va. 122; *McMaster* v. *Edgar*, 22 W. Va. 673; *Stockdale* v. *Harris*, 23 W. Va. 499; *Herzog* v. *Weiler*, 24 W. Va. 199; *Maxwell* v. *Handshaw*, Id. 405; *Bank* v. *Wilson*, 25 W. Va. 242.)"

In the case before us this "simple doubt or probability" has not been raised. In endeavoring to ascertain, what there was in this case to raise such a doubt I have thought it possible it was raised by certain portions of the evidence, which seemed to me so entirely valueless, that in stating the case I omitted it entirely; but, as counsel for the defendant propounded questions to three witnesses, in order to prove this omitted matter, I presume, he must have attached some importance to it, and for that reason I will now state it. To two of the workmen on the house other than members of Mrs. Timmons's family the question was put:—"Was it not generally understood in the community, that her father and his sons paid for and built the property in controversy?" And they answered, that they knew nothing about that. But a third workman, who seems to have been engaged only in hauling materials for building, "draying," as he called it, in answer to the question— "Have you not always known and been informed of the fact, that her father and brothers built that house for her?" —replied:—"That was the understanding I had;—that they were building it for her"—and to the question asked of the other two workmen he answered:—"I was not attending to that part"—and he afterwards said he did not know, who furnished the money to build the house. All, that this evidence tends to prove, is, that Mrs. Timmons's father and brothers imposed upon one at least of the workmen engaged on the building the impression, that they at their own expense were building the house for her; and that with all their efforts they failed to impose this impression on the other workmen. I can not believe, that this sort of evidence had any weight with the court below, though it was evi-

dently to some extent relied on by the counsel for the defendant.

I suppose, that the real trouble in reaching correct decisions in these cases is, that the rules of law, which have been laid down, have been misapprehended, though this Court has endeavored to make them clear. Yet some seem still to think and act, as though, to establish a fraud in cases like the one before us, required evidence almost as strong as the evidence required to convict in a criminal prosecution; and when fraud is established by direct proof or by necessary inference, they seem to think, that the slightest evidence ought to be regarded as sufficient to explain and rebut the facts, which establish the fraud. It is hoped, that these erroneous views will be abandoned; for, if they prevail, our married woman's act and acts permitting interested witnesses and parties to testify and husbands and wives to testify for each other will be utterly perverted from the purpose, for which these acts were passed; and they will become the fruitful source of fraud and perjury. These acts were not designed, and the courts should not permit dishonest debtors to use them, to defraud their honest creditors and to retain their property for their own use by withdrawing it from their creditors by fraudulent investments of it in the names of their wives. This practice is becoming too common and should be strongly discountenanced by the courts. It can not be effectually checked, so long as the false views of the evidence necessary to establish fraud in such cases and to rebut it, when *prima facie* established, are abandoned.

It remains only in this case for us to determine in what manner this house and lot shall be subjected to the payment of the plaintiff's debt, whether by renting out the property or by its sale. It has been contended, that, if the rents of the property will pay the debt in five years or in a reasonable time, the property should not be sold. This suit was not brought simply to enforce the plaintiff's judgment-lien against real estate. Its real object was to set aside the conveyance of this lot to the debtor's wife as fraudulent against the plaintiff, a creditor of the husband, and to subject the house and lot in the hands of the fraudulent gran-

tee, the wife, to the payment of this debt of her husband's. This could be done, though the plaintiff had not recovered a judgment on his debt. The deed, though fraudulent as to the creditors of the husband, is nevertheless binding on the grantor and on the husband of the grantee. (*Murdoch* v. *Wells*, 9 W. Va. 552; *Duncan* v. *Custard*, 24 W. Va. 730). Mrs. Josephine E. Timmons holds this house and lot as her own subject to the debts of her husband, against whose creditors this deed may be declared fraudulent. This house and lot, if sold, will be sold as hers and not as the property of her husband. It is therefore not proper in such a case either to convene the husband's creditors or to rent out the property. The wife in this case therefore has no right to require the house and lot to be rented out to pay the plaintiff's debt charged upon it, though it should appear that said debt could thus be paid in less than five years or in a reasonable time. If it was apparent, that the only debt chargeable on the house and lot could be paid in a short time by renting the house, it might be within the discretion of the Court to do so. (*Core* v. *Cunningham*, 27 W. Va. 210). In the case before us it would probably take four years' rent of the house to pay the plaintiff's debt with the costs. He has already been delayed seven years by the fraudulent conduct of the defendants; and it would be unreasonable to subject him to further and unnecessary delay in order that the defendants might possibly derive some benefit. This house and lot should therefore be sold to pay the plaintiff's debt and the costs in this Court and in the court below.

My conclusion therefore is, that the decree of the Circuit Court of Pleasants county rendered on the 16th day of June, 1886, should be set aside, reversed and annulled, and the appellant must recover of the appellee his costs in this Court expended; and this cause must be remanded to the Circuit Court of Pleasants county by a proper decree to be therein entered to subject this house and lot to the plaintiff's claim of $168.48, with interest thereon from the 16th day of June, 1886, till paid and the costs of the plaintiff in this cause both in the Circuit Court and in this Court, and with instructions to enter a proper decree for the sale of said house and lot,

if the said charge thereupon is not paid in a reasonable time to be fixed by the court below, and to proceed further in the cause according to the principles governing courts of equity.

REVERSED.   REMANDED.

# CHARLESTON.

