# WHEELING.

## FRANK *et al* v. ZEIGLER *et al.*

Submitted January 23, 1899—Decided June 17, 1899.

1. APPEAL—*Parties*.

   All parties against whom a decree is pronounced, interested in the main question decided, may unite in an appeal, though their interests are separate, or affected differently by the decree. (p. 617.)

2. APPEAL—*Creditors—Fraudulent Conveyance*.

   Different creditors, parties to a suit attacking a conveyance as fraudulent, may unite in an appeal from a decree holding it valid to their prejudice. (p. 617,)

3. APPEARANCE—*Service of Process*.

   If a party appear in a suit for any purpose other than to object to the legality of process or its service, it is a general, not a special, appearance, and dispenses with service of process. (p. 618.)

4. APPEARANCE—*Parties*.

   Appearance in a suit by a person not a party, as to whom the bill has no allegation, does not bind him by a decree therein. (p. 619).

5. ACCEPTANCE OF SERVICE—*Joint Notice*.

   Acceptance of service or notice of the execution of an order of reference, the notice being joint in two suits, and appearance before the commissioner, will not bind a person to a decree proper under the pleadings in only one of them, where the person not appearing is not a party to that suit, and its pleadings contain

no allegation touching him. The appearance is limited to the suit in which he is a party. (p. 619).

6. ASSIGNMENT—*Preferred Creditors.*

Chapter 4, Acts 1895, allows the assignments of notes and other evidences of debt in payment of, or as security for, a *bona fide* debt, by one who is insolvent, even if *nothing* is left for his other creditors. (p. 620).

7. FRAUDULENT CONVEYANCE—*Value Received—Payment of Debts.*

A transfer of his property by a debtor is void as to his creditors, even though the grantee pay the full value, and though it is applied on *bona fide* debts of the grantor, if the intent of the grantor in making the transfer was to hinder, delay, or defraud other creditors, and the grantee had notice of the grantor's fraudulent intent. (p. 623).

Appeal from Circuit Court, Cabell County.

Actions by Frank & Adler and others against J. Zeigler, and by Bohm Bros. & Co. against the same and other defendants. The causes were consolidated. From the decree, Burgunder Bros. & Co. and others appeal.

*Reversed.*

SIMMS & ENSLOW, for appellants.

CAMPBELL, HOLT & CAMPBELL, BROWN, JACKSON & KNIGHT, and VINSON & THOMPSON, for appellees.

BRANNON, JUDGE:

Jacob Zeigler for years prior to 1896 carried on the business of a merchant, selling chiefly ready-made clothing; having one store at Huntington and one at Charleston, the average stock in each being about the value of ten thousand dollars. He owned a storehouse in Huntington, valued at five thousand dollars, which was under a lien for about that amount. In May, 1896, he was very deeply indebted, —far beyond his assets. He owed the lien on the storehouse. He owed the First National Bank of Huntington and the Kanawha Valley Bank and Citizens' National Bank of Charleston a large amount,—at least eight thousand dollars. He owed various wholesale merchants for goods, say, fifty thousand dollars. The Huntington bank informed Zeigler that his notes to it would soon mature, and would not be renewed, and must be paid. Zeigler was unable to raise the money. Thereupon he sold the Huntington store, at twelve thousand three hundred and seventy-

five dollars and seventy-one cents, to Max Schwab, his son-in-law, Joseph Zeigler, his son, and Dave, Schwab, a brother of Max Schwab, who thereupon formed a partnership in the name of Schwab & Co.; and the firm gave Jacob Zeigler its notes for the purchase money, accompanied by certain notes of other parties as collateral security for a part of the firm notes. These firm notes were assigned to said banks by Jacob Zeigler as collateral security for the notes they held against him. This sale was on the 18th May, 1896. On 19th May, 1896, Bohm Bros. & Co., and other creditors of Jacob Zeigler, to whom he was indebted for goods, brought suits against him and Schwab & Co., attacking said sale as fraudulent, and levied attachments on the Huntington stock of goods, in the hands of Schwab & Co. On 19th May, 1896, Jacob Zeigler conveyed to Z. T. Vinson his Charleston stock of goods, all debts due him, and said Huntington storehouse, —in fact, all property he owned,—for the benefit of all creditors. On 26th May, 1896, the two suits now in hand were brought in the circuit court of Cabell County. One of them is by Frank & Adler against Zeigler and others, attacking as fraudulent against them and other creditors the sale of the Huntington store to Schwab & Co., stating the attachments levied upon it, and their liens, and that the goods were in the hands of the sheriff under them, but alleging that they could not be disposed of by the sheriff for the best interests of all, asked that a receiver be appointed to take them in charge and sell them. To this bill the attachment creditors were made parties. The other suit is by Frank & Adler, Joe Schoenman, and the Czar Cycle Company against Zeigler and others, to subject Zeigler's property, which he had conveyed to Vinson, trustee, to the payment of his debts, and to subject the notes given by Schwab & Co. to Zeigler for the Huntington stock of goods likewise to the payment of Zeigler's debts, thus denying the right of the banks to those notes as collateral for their debts, and to turn those notes over to the receiver, and to settle all the rights of Zeigler's creditors as to these various properties. The attaching creditors were not parties to this suit. The two suits were united for hearing. Receivers were appointed, and they took possession of and sold the stock of goods, and the fund therefrom is in the hands of the court. In the

suit of Frank & Adler, Schoeneman, and the cycle compa-
ny, called the "Schoeneman suit," and order of reference
was entered to report the debts of Zeigler; the quantity
of goods in the store at the time of its sale to Schwab &
Co.; what disposition Zeigler made of the proceeds of its
sale; what property and funds went into the hands of Vin-
son, trustee, and the disposition thereof; what considera-
tion passed from Zeigler's wife for all the property claimed
by her. The commissioner reported the sale of the Hun-
tington stock of goods as valid, and the transfer of the
notes of Schwab & Co. to the bank as also valid. The two
cases were then heard together, and a decree was entered
holding both the the sale of the goods and the transfer of
the notes to the bank as valid. Later these attaching cred-
itors, as parties not appearing, filed a petition to reverse
the decree; and, the court refusing to reverse it, they ap-
peal.

First question: Schwab & Co. moved the dismissal of
this appeal on the ground that the several different firms
join in it. No authority for this position is cited, save
*Cooey* v. *Porter*, 22 W. Va. 120, and I see nothing there to
sustain it. The debts of these creditors are separate, it is
true; but their interests in the matters litigated, and in
the property and the fund, are in common. The fraud in
the sale, affecting one, affects all. They were all brought
before the court, and their rights set up in one of the bills;
and a common decree, if wrong, prejudices all alike, and
there is no reason why they should not unite in one ap-
peal. "Parties having a separate interest, aggrieved in the
same way by the same decree, may prosecute a joint appeal;
as separate creditors of an insolvent debtor appealing from
a decree directing the mode of payment of their debts."
If all against whom a judgment or decree is rendered are
interested in the main question decided, they may appeal
jointly, though the judgment be in form separate against
each. 2 Enc. Pl. & Prac. 189, citing *In re California Mut.
Life Ins. Co.* 81 Cal. 364, 22 Pac. 869, and *Kaehler* v. *Hal-
pin*, 59 Wis. 42, (17 N. W. 868.) "Upon principle, it would
seem reasonable that the whole cause ought to be brought
before the court, and that all the parties who are united in
interest ought to unite in the appeal." *Owings* v. *Kincan-
non*, 7 Pet. 399,—an equity case. See *Lovejoy* v. *Irelan*, 79,

Am. Dec. 667. In *Kaehler* v. *Halpin, supra,* a decree imposed upon each of eleven persons a separate fine for violation of an injunction, after finding all guilty, and a joint appeal was held proper. The opinion says that all were interested in the main question,—whether the order adjudging them guilty was properly made,—and all had a like interest in that question. Under our practice, all would be summoned as appellees. *Blowpipe Co.* v. *Spencer,* 46 W. Va. 590, (33 S. E. 342); *Newman* v. *Mollohan,* 10 W. Va. 488. All are alike prejudiced by the decree, why not all unite in an appeal, and be appellants as well as appellees, to save expense of separate appeal? Must each of many creditors injured by a decree sustaining a fraudulent deed resort to separate appeals from one decree deciding the same question as to all? If there were different appeals, it might happen there would be conflicting decisions.

Second question: The appellants say that the decree must be reversed because they were not served with process in the Frank & Adler case, and because there was no publication against them, though parties, and they were not parties to the Schoeneman case. As to the Frank & Adler case: The record shows that "on motion of Jacob Miller Sons & Co,, and other attaching creditors," a previous order was modified. The object of service of process is only to notify persons of the suit, and bring them under the power of the court. Appearance answers the same purpose. By it the party submits himself to the jurisdiction of the court. Any appearance, except to object to the jurisdiction,—as, for instance, to take advantage of defect in process or return,—is a general appearance, not special, and will dispense with its service. Any motion in the case will do so. 2 Enc. Pl. & Prac. 632-637; *Layne* v. *Railroad Co.* 35 W. Va. 438, (14 S. E. 123.) The words "other attaching creditors," though general, would be made specific by the bill, applying to all its parties having attachments. Therefore the attaching creditors are bound by decree holding valid the sale, unless they can for other cause reverse it. Next the Schoeneman suit: It is said that the attaching creditors appeared to this suit by indorsing on answers therein exceptions. and by accepting notice of the execution of an order of reference, and by appearing and taking depositions. This would not make them parties, when they

were not mentioned in the bill, and their interests were not stated. *Bland* v. *Stewart*, 35 W. Va. 518, (14 S. E. 215); *Burley* v. *Weller*, 14 W. Va. 264. And it is claimed that because Frank & Adler asked for themselves and other defendants of the commissioner, a special statement, this was an appearance. But these creditors were not defendants to this suit, and Frank & Adler's request could not bind them, anyhow. And, besides, if they themselves had made the request, as it was a joint notice in both cases, it would apply only to the suit of Frank & Adler, to which they were parties, as both cases were before the commissioner. Must they fail to attend to one, on peril of becoming bound in the other suit, though not parties to it? So with appearance to the depositions. And this was long before the order of consolidation. I decide these points as to appearance in the Schoeneman suit because they arise and are discussed, but they are not material to the decision. That suit recognized the validity of the sale by Zeigler to Schwab & Co., and sought to take from the banks the sole benefit of the notes given under the sale to Schwab & Co., and the Frank & Adler suit, though it attacked the sale, did not mention the transfer of the notes to the banks; and therefore it might be thought, at first, that the feature of the decree holding good the right of the banks to those notes against the attachments would be error, because based alone on a bill to which the attachment creditors were not parties, and which contains nothing as to their rights. And this would be so, provided they had any valid claims on those notes; but those creditors had no such claim, their claim being limited to the stock of goods itself, under the attachments levied on it. A decree as to the validity of the sale could be rendered as to them,—they being parties in that suit. So, though the point is urged, I do not see anything in the point that these creditors were not served with process and did not appear. Burgunder Bros., attaching creditors, were parties to neither suit, and, not being affected, cannot reverse as if they were parties.

Third question: Appellants point out that the bill of Frank & Adler stated their attachments, and recognized them as valid liens, and the answers of Zeigler and Schwab & Co. did not attack them, and that this alone demanded a decree allowing them as liens. The response is that the

answers denied all fraud in the sale of the goods, but alleged it to be valid. If valid, that sale would deprive the attachment of all force as a lien on the goods, because it antedated the attachments. Hence, when the answers put in issue the fraud in the sale, they put in issue the lien of the attachments, as a legal consequence.

Fourth question: As the attaching creditors were not parties to the only bill involving the rights of the banks to the Schwab & Co. notes, it may be questioned whether we ought to pass thereon; but as it is to the interests of all parties that it should be decided, and as the petition filed by these creditors to reverse the decree assigns this matter as error, and as attorneys for these creditors present it for decision, we pass on it. In fact, I think that petition calls on us to do so. The right of the banks to those notes as collateral for their debts is not controverted on the ground of their transfer being tainted with fraud in fact, but on the ground of its being legal fraud, as an unlawful preference of one creditor over another. As is well known, at common law an insolvent man could, in good faith, transfer any estate for payment of one honest debt over another, though nothing was left for that other; but statute law changes this to a certain extent, not wholly. While chapter 4, Acts 1895, does curtail this power to give preference, its closing proviso excepts from the operation of the act the transfer of notes and other evidences of debt in payment of, and as security for, a *bona fide* debt; thus leaving such transfer still under the common-law rule. The question of whether, as the notes are negotiable, and the bank a holder for value, it could hold them if the statute applied, does not arise, as the statute does not apply to the matter. The right of the banks to the notes, as against the attaching creditors, is good, beyond question. We do not decide, as between the banks and Schwab & Co., as to those notes.

Fifth question: Was the sale of the Huntington stock of goods by Zeigler to Schwab & Co. in fraud of creditors? Zeigler was overwhelmed by a mountain of debt here, there, and everywhere, amounting to about sixty thousand dollars,—likely more,—and his assets about twenty thousand dollars. He was illiterate, but had had a long business experience as a merchant in large business. He had been in business at Huntington since 1882. At the

date of the sale he had a store in Charleston and one in Huntington, with an average stock in each of ten thousand dollars or twelve thousand dollars. He had paid up all bills to the spring of 1896. He was, however, in debt to banks at least eight thousand dollars. There was also a lien on his Huntington store building to its value. On the 17th of April, 1896, he made statements to wholesale merchants of his assets and liabilities, according to an invoice taken 18th July, 1895, showing assets over liabilities forty-four thousand three hundred dollars. This was vastly overdrawn and fictitious. It was intended to inspire confidence of decided solvency, especially as he had paid up antecedent purchases, likely with the aid of money borrowed from the banks. He was inspiring confidence so as to effect large purchases of goods of wholesale merchants at various different points, and he did that spring make numerous large purchases from merchants at different points. He purchased goods on credit between 1st December, 1895, and 20th May, 1896, costing forty-five thousand six hundred and sixty-seven dollars and ninety-seven cents,—likely more,—and owed for goods, when he made the sale, forty-five thousand and thirty dollars and seventy-five cents; and he owed bank debts and the lien on his Huntington storehouse, the last debt being four thousand nine hundred and sixty-seven dollars and forty-six cents, and the bank debts eight thousand dollars. His indebtedness may have been larger. From December to his failure he sold goods exclusively for cash, amounting to from forty thousand dollars to fifty thousand dollars. Where this money went, does not appear. He kept no books. His checks on the banks are gone. He does not appear to have used it in paying debts. None were paid, we may say. He does not show it. The debts now involved were not matured when he failed. He is utterly unable to show where all this cash went, though pressed to do so. As a witness, he did not remember. He could not specify the parties to whom he paid. It is a most singular and wonderful instance of entire failure in a large business to specify the disposition of a large amount of cash by books, checks, receipts, or otherwise. He seems to have marked out the program of saying in these matters, "I don't know," "I can't remember," to suppress all light. His son Harry,

who chiefly controlled the Huntington business, does the same,—gives no light, books, checks, or receipts, or other specification of where this money went. He does say that he squandered it by playing poker and otherwise "blowing it in," in his language, but does not specify where he lost more than one thousand dollars. He does not specify. His account is utterly unsatisfactory,—wonderfully so. All this impresses us with the conviction that Zeigler "broke fullhanded," and pocketed this cash from suffering creditors. Their own evidence gives the case this hue in many particulars, which I cannot represent without tedious, useless detail. This view is confirmed by the evidence of a bank teller that Max Schwab, a clerk in Zeigler's Huntington store, and perhaps Dave, also, frequently brought small notes to the bank and exchanged them for one hundred dollar notes. Was this done in order more readily to hide away the money? When the bank debts were pressing Zeigler, and he was unable to pay,—when the mountain of debt for goods was soon to come down upon him,—he sold the Huntington store to a son, a son-in-law, and a brother of that son-in-law,—not strangers. The fact that close kindred were called in at this pressing time affords a circumstance against the purity of the transaction. _Burt_ v. _Timmons_, 29 W. Va. 441, (2 S. E. 780). But we must not here lose sight of a fact of importance. They did not pay cash. The purchase money or its payment is not fictitious. There is no inadequacy of price, for they paid full value. And what they paid went to pay Zeigler's honest debts, not to Zeigler's secret pockets. These facts go strongly to repel fraud, at first blush. One naturally asks, how can the sale be fraudulent, when its proceeds went to pay an honest debt? There would seem to be no fraudulent motive. Were there no other facts, there would be absent a fraudulent motive; but there is another controlling fact, Mrs. Zeigler in 1887 acquired lots in Huntington, on which she built a brick residence. It was paid for out of a business carried on in her name, but made successful by the labor and capacity of her husband. She had indorsed his paper to the above-named banks for at least eight thousand dollars. Unless the bank indebtedness should be removed, the home would be swept away in the great flood of Zeigler's indebtedness,—swept away from Zeigler, swept

away from his wife, swept away from his family. This is why that store was sold and its proceeds applied on those bank debts. This is the motive moving the action of Zeigler, his son, son-in-law, and friend. Others must suffer, but Zeigler and his wife and family must be saved a home. It thus went to the benefit of Zeigler and family. No matter that the sale went on just debts, no matter about the form of the transaction, the fact remains that Zeigler's Huntington store went to save himself and family a home, consisting of valuable property, to the prejudice of other creditors; in other words, Zeigler's store goes to the direct benefit of himself and family, while his just creditors suffer. And this result is accomplished through close relatives and a close friend. Equity looks at substance and not results, not mere form. It finds the fraud, no matter in what form or cover it comes. We cannot prove fraud directly. Generally it must appear from circumstances. Look at the circumstances of each particular transaction, the situation and relation of the parties, and the motives and purposes probably moving them. We must judge by what we know of human nature, of man's conduct, without proof. We must thus ascertain and say why men did a given act,—what was their aim, their end in view. Did the son and son-in-law know of Zeigler's vast indebtedness? Both were clerks and present in the store, and saw the loads of goods coming in, and they knew they were on credit. How could they help but know these things, encountering them face to face every day? Who more likely to know of this foreign indebtedness, as they certainly knew of the bank debts? The case is pregnant with means of knowledge to them. It would be against all fair probability to say that they were ignorant of the true state of things. Did these purchasers know that Mrs. Zeigler's house was in danger? Would not the son and son-in-law know that she was her husband's bank indorser for a large sum? "Notice of fraud need only to be sufficient to put a man of ordinary prudence and experience in business transactions on inquiry. * * * Whatever is sufficient to direct his attention to the prior rights of creditors, and enable him to ascertain their nature by inquiry, will operate as notice." Bump, Fraud. Conv. section 494. "The nature and circumstances of the transaction may sometimes be such as must apprise the

grantee of its character and object. '*Res ipsa loquitur.*' ('The thing itself tells.') If he has notice sufficient to put him on inquiry, he cannot be deemed a *bona fide* purchaser." Id. section 184. Circumstances will prove fraud. *Farley* v. *Bateman*, 40 W. Va. 540, (22 S. E. 72); *Reynolds, Adm'rs* v. *Gawthrop Heirs*, 37 W. Va. 3, (16 S. E. 364). The facts make a *prima facie* case of fraud,—good until other facts overthrow it. *Parker* v. *Valentine*, 27 W. Va. 677. Though a party pay full consideration, yet if he knows, or has notice to warn him, of the fraudulent intent of his grantor, what he pays does him no good, he loses the consideration, and the property goes to creditors. *Goshorn's Ex'r* v. *Snodgrass*, 17 W. Va. 717, 770; *Gillespie* v. *Allen*, 37 W. Va. 675, (17 S. E. 184). Therefore the proceeds of the goods are liable to creditors of Jacob Zeigler, and the attaching creditors have preference of payment out of same, by reason of their attachments. Decree reversed and case remanded.

*Reversed.*