# CHARLESTON.

DOUGLASS *v.* DOUGLASS *et al.*

Submitted June 19, 1895—Decided November 13, 1895.

1. FRAUDULENT CONVEYANCE—*Bona Fide* PURCHASER.
   A *bona fide* sale, for a fair price, to an innocent purchaser, should not be set aside at the instance of the creditor of the grantor, on the grounds of alleged fraud, for the sole reason that in the opinion of sundry witnesses the property might have brought a larger price if sold on credit.

2. RELATIONSHIP OF PARTIES.
   While transactions between father and son are subject to critical scrutiny, yet if the circumstances show them to be fair, open, and free from fraudulent intent, the relationship of the parties will not vitiate or render them void.

J. Hop Woods for appellant, cited Code, c. 74, s. 1; 35 W. Va. 634; 28 W. Va. 715, 2d pt. of syllabus.

M. Peck and Dayton & Dayton for appellees:

I.— *Transactions between father and son.*—30 W. Va. 555; 34 W. Va. 96, 105; 23 W. Va. 639.

II.—*Circumstances often the only proof of fraud.*—35 W. Va. 719; 29 W. Va. 451; 22 Pa. St. 179; 10 W. Va. 78; 23 W. Va. 644; 22 W. Va. 585; 34 W. Va. 96, 105,

III.—*Absence of change of possession on delivery of deed.*— 55 Ala. 300; 40 Ala, 259; 7 Gratt. 185; 4 Gratt, 422; 52 Me. 481; 34 W. Va. 105.

IV.—*Inadequate Consideration.*—59 Mo. 537; 1 Tex. 415; 4 Pa. St. 178; 22 W. Va. 585–6.

V.—*Adequate consideration with fraudulent Intent.*—22 W. Va. 593–4; 17 W. Va. 717, 764; 68 Ala. 192.

VI.—*Notice to the purchaser of fraud in grantee. Actual and constructive notice.*—Ency. of Law, vol. 8, p.758; 46 N. Y. 384; 15 N. Y. 362; 39 N. Y. 70.

Dent, Judge:

S. C. Douglass, trading and doing business under the firm name and style of S. C. Douglass & Co., filed his bill under oath in the Circuit Court of Barbour county, at August rules, 1893, against C. C. Douglass and S. H. Douglass (father and son, and brother and nephew to plaintiff); seeking to set aside a certain deed executed by C. C. Douglass to S. H. Douglass, as fraudulent and void as to a judgment held by him against C. C. Douglass. The defendants both answer said bill denying fraud. Their answers are under oath, and to them plaintiff replies generally. Numerous depositions are taken. On the hearing the Circuit Court set aside the deed, as fraudulent, and directed sale of the property. S. H. Douglass appeals to this Court, and insists that the decree as to him, is erroneous, and should be reversed.

There are two questions presented for examination: (1) Was the deed of the 22d day of February, 1893, by C. C. Douglass to S. H. Douglass, made with intent to delay, hinder and defraud his creditors? (2) Had S. H. Douglass being a purchaser for value, notice of such fraudulent intent?

The facts, as disclosed by the evidence, are as follows, to wit: In October, 1889, Isaac V. Johnson—being a creditor of one J. M. Woodford—at a forced sale of Woodford's property, purchased the house and lot in controversy at the price of one thousand dollars. He made the cash payment, about seventy dollars, but, not desiring the property, induced C. C. Douglass to take it at the price paid by him, less the cash payment, and to execute his (Douglass') notes, with him (Johnson) as surety. This was done, and the sale was reported, and confirmed to Douglass. Douglass took possession of the property, and put necessary repairs and improvements thereon, to the amount of one hundred and fifty dollars. Douglass paid nothing on the purchase-money, and when all the notes fell due, in the latter part of 1892, at the instance of Johnson, the commissioners brought suit to resell the property for the purchase-money, then amounting to about one thousand one hundred and fifty dollars. Douglass then went to Doddridge county, to his father, a man of some means (the defendant S. H. Douglass) and asked him to buy the property. The father agreed to buy it at eight hundred dollars, furnish the money to pay off the full lien, loan him three hundred and fifty in addition, and permit him (said C. C. Douglass) to live in the property for an indefinite time, provided he put certain repairs on the property. To consummate this arrangement S. H. Douglass borrowed from Frances J. Maxwell the sum of one thousand five hundred dollars, and to secure which he gave a lien on his land in Doddridge county. This one thousand five hundred dollars he turned over to his son, who paid one thousand one hundred and fifty dollars purchase-money to the commissioners, who took a deed for the property, and immediately conveyed the same to his father, in consideration, as the deed recites, "of the sum of eight hundred dollars in hand paid, the receipt of which is hereby acknowledged and other valuable considerations not herein mentioned." What became of the other three hundred and fifty dollars is not disclosed. The evidence shows the son certainly received it, and for it and the three hundred and fifty dollars extra purchase-money he executed his individual note to his father, payable five

years after date, with interest payable annually. The other valuable considerations mentioned in the deed are explained by the son, who was alone interrogated on the subject, to mean that he was to remain in possession of, and have the use of the property, for an indefinite time, and put certain repairs on the same. The father states emphatically that he only considered the property worth eight hundred dollars, and would give no more for it.

While the property transactions were going on, plaintiff and defendant C. C Douglass had a running, unsettled account, which continued for about three months after the deed was made, when plaintiff brought suit against C. C. Douglass and recovered judgment for two hundred and seventy seven dollars and seventy eight cents and twelve dollars and fifteen cents costs, issued execution thereon and received a schedule of defendant's personal property for his pains. He then brought this suit. The badges of fraud insisted on by the plaintiff are (1) the indebtedness of the grantor; (2) his insolvency; (3) sale of the property for an inadequate consideration; (4) the relationship of the parties; (5) possession remaining with the grantor. The answers made to these are: (1) at the time of the deed the indebtedness was unascertained; (2) insolvency admitted; (3) property sold for its fair cash value; (4) the dealings having been fair, relationship can not affect them; (5) a father has the right to rent his property to his son, either with or without payment of rent.

The circumstances of this transaction clearly disprove any fraudulent intent on the part of the grantor in making the sale, at the time thereof. In other words he had to make the sale. He owed every dollar of the purchase-money, and, on account of his clearly admitted insolvency, had nothing to pay with, and the property must be sacrificed either at public or private sale. Thus hemmed in, he appeals to his father. He does not want the property, because he lives far away from it, but finally agrees to take it at eight hundred dollars—what he considers its full value—and to loan his son an additional sum of seven hundred dollars, provided he pays the residue of the purchase-money out of the same.

The whole transaction refutes the fraud charged; for, if either had contemplated fraud, they could have honestly made the deed to recite a consideration equal to the amount of the unpaid purchase-money, or the full one thousand five hundred dollar loan. The very best evidence of fair dealing is that the father insisted on taking the property at what he considered its fair value eight hundred dollars, while he advanced to his son, without security, a sufficient sum to pay the residue of the purchase-money. Nor is there any evidence in the least tending to prove that the father had any reason to doubt the integrity of his son, or tending to show that he knew his son was otherwise indebted than for the property in controversy. With mere verbal promises on the part of his son, he borrowed one thousand five hundred dollars, by mortgaging his land, and sent it to his son, trusting entirely in his honesty in carrying out those promises. The most that possibly can be maintained under the evidence, is that to the excess of the value of the property over the consideration of eight hundred dollars, the conveyance was voluntary, or a gift from the son to the father; but equity would hold that a gift from the father to the son was not in the property, as the father had to pay the purchase-money therefor, to its full value, but was included in the unpaid and un-secured note given by the son to the father, and, to the extent of such excess, would substitute plaintiff to the benefit of such note, if asked by him, and credit the son, to that extent, as against his father, if he should request it. In the case of *Harden* v. *Wagner*, 22 W. Va. 370, Judge Snyder says: "as to the relationship of the parties, it may be stated that while the law allows no discrimination in favor of creditors by reason of their being related to the debtor, it certainly does not put them to a disadvantage. The debtor may do no more for them than a stranger, but there is no rule of law that he may not do as much." And referring to relatives: "Because   *   *   *   conveyances between such persons are more closely scrutinized than those between strangers, it does not follow that a conveyance which appears to be fair and honest after the most rigid scrutiny, must be declared fraudulent and set aside upon suspicion that it may be fraud-

ulent, merely upon the ground that it is made between two near relatives." The only possible reason that the court could have had for setting aside the deed is that the consideration eight hundred dollars contained in the deed is inadequate, and that this alone evinces a fraudulent intent on the part of the grantor, participated in by the grantee. This, however, shows no fraudulent intent, but is fully explained from the fact that the grantor was bound to sacrifice his property, and he did so to the sole person who would let him have a sufficient amount to more than fully satisfy the unpaid purchase-money and costs. But was the consideration inadequate? Numerous witnesses, widely differing in their notions, testify on the subject, estimating the value of the property all the way from seven hundred dollars and less to one thousand five hundred dollars. Nearly if not all are unquestioned as to the real matter of dispute. They are asked simply as to the abstract value of the property, when the question should have been as to its fair cash value. The property was in such a condition that cash had to be paid for it, to the amount of one thousand one hundred and fifty dollars, or the costs and expenses of legal sale would greatly increase this amount. The father agrees to pay the full amount, one thousand one hundred and fifty dollars, but will only take the property as a credit thereon at the value of eight hundred dollars. This he claims to be its fair cash value. The property was sold at public auction. An interested creditor made it bring one thousand dollars, but in so doing he lost seventy dollars. The sale thus stood at nine hundred and thirty dollars on time or credit. This witness' testimony is to the effect that the property would be reasonably low at nine hundred dollars, on a credit of one, two and three years, to a man wanting a home. For cash, it would bring less. This testimony is conservative, and fairly averages with the testimony of all the witnesses in the case; from which it is plainly apparent that the fair cash value of the property at the date of the deed did not exceed eight hundred dollars, while in open market, at a credit sale, it might have brought a few hundred dollars in excess of this amount; the improve-

ments, as shown in the evidence, having added to its value about one hundred dollars. If even the fraudulent intent existed in the grantor, the fact that the property sold for a less amount for cash than it might sell for on credit is not a sufficient circumstance to justify the court in imputing knowledge of such fraudulent intent to an otherwise in-innocent grantee; for, if such be the law, no sale, however fair, could withstand the attack of an importunate creditor, as it is very easy for him, and his friends in his behalf, to put an exorbitant opinion estimate on any controverted prop-erty without being subject to the imputation of false swear-ing. Men's opinions, even under oath, have a limitless field for expansion and contraction, in accordance with their in-terests and secret and unknown motives. From this evi-dence it is simply impossible to say that the deed in contro-versy was made with fraudulent intent, and it is much less possible to say that the grantee had any notice of such intent.

There is some attempt to show conduct on the part of the grantor, subsequent to the making of the deed, which evinces a disposition on his part to evade payment of plaintiff's claim. But such conduct can not be made to relate back to and affect a contract fair and *bona fide* at the time of its execution. "A conveyance not fraudulent in its inception can not become so by matters subsequent." *Harden* v. *Wagner, supra.*

For the foregoing reasons the decree complained of is re-versed, and the bill is dismissed.