# CHARLESTON.

## MILLER v. GILLISPIE.

Submitted June 13, 1903—Decided December 16, 1903.

1. HUSBAND AND WIFE—*Fraudulent Conveyance.*

    When a wife claims, in a contest against the creditors of her husband, to have purchasd and improved real estate, there is a presumption against the *bona fides* of the transaction, which she cannot over come except by clear and full proof that the property and improvements were paid for by her with money derived from some source other than her husband. (p. 460).

2. FRADULENT CONVEYANCE.

    Fraud is to be legally inferred from the facts and circumstances of the case, when they are such as to lead a reasonable man to the conclusion that the property was purchased and improved by the husband with intent to hinder, delay or defraud existing or future creditors. (p. 461).

3. FRAUDULENT CONVEYANCE.

    When, in such case, the transaction is attacked by a subsequent creditor, upon the ground of actual fraud, the fact that the transfer or conveyance is not upon a consideration deemed valuable in law may be treated as evidence of the fraud, and need not be alleged in the bill. (p. 462).

4. DEPOSITIONS—*Agreement.*

    In the absence of an agreement to the contrary, depositions taken in one suit cannot be used in another, unless the parties are the same, or are in privity, and the subject matter of the suits is also the same. (p. 462).

5. DEPOSITIONS.

    A deposition taken by the defendant in a suit brought by one creditor to set aside a fraudulent conveyance, cannot be used by the defendant in another suit brought by another creditor to impeach the same conveyance, unless by agreement. (p. 462).

Appeal from Circuit Court, Webster County.

Bill by Rachel F. Miller against J. M. Gillispie and Mary Gillispie. Decree for defendants, and plaintiff appeals.

*Reversed.*

C. C. Higginbotham, Edward A. Brannon, Robert C. Linn and J. M. Hoover, for appellant.

Mllohan, McClintic & Mathews, for appellees.

Poffenbarger, Judge:

Assuming that the court properly overruled the demurrer to the bill in this cause, the sole question is whether the lower court properly held that certain real estate, owned by Mary E. Gillispie and situated in the town of Addison, Webster County, was purchased for her by her husband, who is insolvent, in fraud of his creditors, or by her with money so fraudulently furnished by him. Mrs. Gillispie seeks to overcome the presumption which legally arises against her by showing that the lot was bought by her with money of her own, money given to her by her father, money loaned to her by her father, money borrowed by her from her brother-in-law and money made by her in keeping boarders, selling milk and butter &c. The two adjoining lots cost four hundred and twenty-five dollars. The first was conveyed to her by Benjamin Hamrick and wife, by deed dated August 18, 1894, in consideration of two hundred dollars, of which one hundred dollars was paid in cash and the balance, due in one year, secured by a lien reserved in the deed. The other lot was conveyed to her by the same parties, by deed dated October 16, 1897, in consideration of two hundred and twenty-five dollars, the deed reciting the receipt of the purchase money. On the first lot so purchased, there has been erected a dwelling house. The contract price for it was six hundred and twenty-five dollars, exclusive of the painting which cost seventy-five dollars, and the chimneys and flues, costing seventy-five dollars. Other improvements were put upon the property including a cellar, costing, as stated by Mrs. Gillispie, sixty-two dollars, a barn costing sixty-five dollars, a well costing forty dollars, a pump fifteen dollars, and a fence fifteen dollars. The total cost of property and improvements was about one thousand, three hundred and ninety-seven dollars. Mrs. Gillispie says she obtained the money with which this property was bought and improved in the following amounts and from the following sources: Money she had when married, June, 1894, fifty dollars; gift from her father twenty dollars; from David Morton note twenty dollars;

from David Morton, borrowed money, ten dollars; loan made to her by Delbert Gillispie one hundred and fifty dollars, for which note was given December 18, 1894; loan made to her by Benjamin Hamrick, two hundred dollars, for one hundred dollars of which a note was given, dated February 4, 1895, and for the residue of which no note was taken; loan made to her by her father, I. W. Skidmore, four hundred dollars, for which she gave her note, dated June 24, 1895; keeping boarders in the year 1896, three hundred and eight dollars and ten cents; keeping boarders in the year 1897, one hundred and six dollars and ten cents; boarding Delbert Gillispie for three years and eight months at ten dollars per month, four hundred and forty dollars; boarding Cherry Woodsell, eighty dollars; boarding Rosa Gillispie, fifty dollars; milk and butter sold, fifty dollars; gift from her father, one hundred dollars; making a total of one thousand, nine hundred and eighty-four dollars and twenty cents.

In support of her contentions and testimony, I. W. Skidmore says he furnished her the money which she claims he furnished. Delbert Gillispie testified that he loaned her said sum of one hundred and fifty dollars and Benjamin Hamrick testifies that he loaned her the two hundred dollars which she says she borrowed from him. She repaid him one hundred dollars with the last one hundred dollars she received from her father, Skidmore. It is not denied that she kept boarders, although it is not admitted that she received from that source the amount she claims to have made thereby, nor that the profit realized was so large as she claims it was. Moreover, it is contended that her table was largely supplied from the store of her husband, although she says she had a good garden and kept cows. An effort is made to show that her father's circumstances were not such as to have warranted such liberality on his part toward his daughter.

While he owns real estate assessed as containing three hundred and fifty-eight acres, valued at one thousand, three hundred and six dollars, it appears that the principal part of it is wild land and only about seventy-five acres of it are cultivated. In the year 1890 he was assessed with personal property amounting to five hundred and seventy-four dollars, including two horses valued at ninety dollars, twelve head of cattle valued at one hundred and sixty-three dollars, and thirty-one head of sheep valued at thirty-

nine dollars.  For the years 1891, 1892, 1893, 1894, 1895, 1896, 1897, 1898 and 1899 his personal property valuations for the purpose of taxation were, respectively, four hundred and fifty-six dollars, six hundred and thirty-six dollars, three hundred and eighty-nine dollars, two hundred and thirty-eight dollars, two hundred and twenty-three dollars, two hundred and thirty-two dollars, two hundred and seventy-nine dollars, two hundred and twenty-nine dollars and one hundred and ninety-one dollars.  While some of the assessors say he mentioned the fact that he had loaned his daughter four hundred dollars, he was never assessed with it for the reason that he explained that it was not to be repaid unless he should need it.  Other witnesses testify to his having borrowed, or attempted to borrow, small amounts of money at various times, while others testify to his having loaned money at various times in small amounts, to his having paid his bills promptly and to his always having had money about him.  It appears that he has been a thrifty and economical man, and he swears he considers himself worth seven or eight thousand dollars.  The improbability of Delbert Gillispie's having loaned the defendant any money is insisted upon for the reason that he was clerk in a store at a salary of about fifteen dollars per month with an allowance of ten dollars per month for board, and had no money, or very little, at the beginning of his service in January, 1893.  In 1895 he was assessed with only twenty dollars worth of personal property; in 1896 with one hundred dollars of which fifty-five dollars was listed under the head of "Money, credits and investments;" in 1897 with ninety dollars, of which fifty dollars was listed under said head; in 1898 with two hundred dollars of which one hundred and fifty was listed under said heading.  He says he had about fifty dollars when he came there besides fifteen or twenty dollars due him from another person which he collected, that he sold a watch for ten or twelve dollars, that he taught a school of penmanship from which he realized twenty-five or thirty dollars, and that he made as much as fifty dollars from the sale of books, rings and other articles not kept in the store by his employers.  But on March 7, 1894, he had a settlement with his employers which showed a balance due him of forty-two dollars and thirty-four cents, as shown by the books and, on the 18th day of December, 1894, he claims to have made this loan and to have had in

money at that time about two hundred and seventy-seven dollars from which to make it. The ability of Hamrick to make his loan of two hundred dollars seems to be conceded.

Other facts bearing upon the question of the *bona fides* of the transaction between Mrs. Gillispie and her husband, necessitates the traversing of a good deal of ground. In 1892 the firm of D. M. Miller & Co., engaged in timber and mercantile business, was composed of D. M. Miller and J. M. Gillispie. Afterwards and before the dissolution of the co-partnership, J. M. Gillispie and his co-defendant, Mary E. Gillispie, intermarried. The business of the firm was conducted by Miller and Gillispie. They had a store at Cowen, Webster County, under the personal supervision of Miller, and another at Addison under the personal control of Gillispie. Delbert Gillispie was a clerk in the store at Addison. He was a brother of J. M. Gillispie and, after the marriage of the latter, boarded with him, as did also the wife of Delbert Gillispie, part of the time. On the 27th day of January, 1896, the firm was dissolved by the death of Miller. After that event the plaintiff herein, Rachel F. Miller, the widow of D. M. Miller, and J. M. Gillispie, formed another co-partnership under the firm name of J. M. Gillispie & Co. and continued the business until in March, 1897, when the new firm was dissolved. The dissolution agreement provided that Gillispie should take the stock of goods and store accounts of the firm, pay all debts of the firm, due or to become due, and secure to the plaintiff the payment of one-half of the surplus. An invoice showed the assets at that time to be about seven thousand, six hundred dollars, of which the stock amounted to four thousand, two hundred dollars and the accounts to three thousand, four hundred dollars. Gillispie continued the business at Addison until in January, 1898, when he made an assignment for the benefit of his creditors, whose claims amounted to several thousand dollars in excess to the amount realized from his assets. He admits that the business of the firm as first composed was profitable and that the new firm made a little money during the first year, but nothing the second year, and he claims the business, after the retirement of Mrs. Miller was crippled by reason of G. A. Lynch, administrator of D. M. Miller, deceased, and agent of Mrs. Miller, having taken from him accounts amounting to about two thousand five hundred dollars, in

addition to some money paid him. Lynch admits having received six hundred and eighty-nine dollars and seventy-three cents from Gillispie and says he thinks he received accounts and evidences of debt in addition thereto but does not remember the amount. His settlement as administrator shows heavy liabilities against D. M. Miller, nearly all of which appear to have been for merchandise, but how much of it grew out of his partnership with Gillispie does not appear.

The debt which is sought to be collected by this suit was originally contracted by the firm of D. M. Miller & Co. One note was for two hundred dollars, dated October 26, 1895, and payable to the order of C. C. Miller. The other was for one hundred dollars, dated December 14, 1895, and payable to the same person. On the 25th day of April, 1896, the firm of J. M. Gillispie & Co. took up the two notes and gave in lieu thereof their own note for three hundred dollars, payable to C. C. Miller. This note was part of the firm indebtedness, assumed by Gillispie in the dissolution agreement. In May, 1898, F. J. Hively, to whom the note had been assigned, recovered a judgment against Gillispie and Mrs. Miller, as partners, and afterwards enforced payment thereof in a chancery suit by the sale of a lot belonging to Mrs. Miller, the plaintiff in this suit.

During the time covered by the purchase of the lots by Mrs. Gillispie and the making of the improvements thereon, as hereinbefore set out, she had dealings in the store of Miller & Co., Gillispie & Co., and J. M. Gillispie, relating directly to her transactions in reference to the purchase and improvement of this property. Part of the purchase money of the lots was paid by J. M. Gillispie to Hamrick, but Mrs. Gillispie and he say she furnished the money and he acted as her agent. She claims to have had an account at the store, carried on a separate book, which has not been produced, and that she paid her grocery account at the store, but says it amounted to but very little, fifty or sixty dollars in 1896, and thirty-five or forty dollars in 1897. She admits that the six hundred and twenty-five dollars, the contract price for building the house, was paid to Brooks Watson, the contractor, partly in merchandise from the store of D. M. Miller & Co. and partly in money. Watson's store account, including part of the lumber, as having been received from "Harris boys" and charged as two hundred and sixteen dollars

and seventeen cents, amounts to three hundred and ninety-eight dollars and fifty-two cents. At the end of it, under date of June 30, 1895, appears the entry, "Cr. By Mary Gillispie, $398.52," closing the account of Watson. She says she paid that amount in cash to her husband in settlement of Watson's account at the store, out of the four hundred dollars received from her father about June 24, 1895, but she took no receipt for anything she claims to have paid him. In another place she says of the Watson account: "I paid it to Mr. Gillispie. Part of it was paid in cash and part of it was paid in Delbert Gillispie's board." At another place she says two hundred dollars was paid in cash to the Harris boys and that Watson "got part of the rest of it out of D. M. Miller & Co.'s store in goods and the balance of it I paid in money." Again she says, in reference to the two hundred dollars paid for the lumber, "I can't answer as to the exact amount but I paid all that they got out of the store, and if they were paid any money Mr. Gillispie paid it and I paid it back to him." While Mrs. Gillispie says her husband had nothing to do with her business of keeping boarders, she admits that he collected a part of the money from her boarders, but says he paid it over to her. Mr. Little who did the painting took part of his pay out of the store and Mrs. Gillispie says she settled his store account. The same explanation is made as to the payment of Mr. Dilley who dug the well. Mrs. Gillispie admits that the first one hundred dollars paid on the lots was handed to Mr. Hamrick by her husband, but says it was her money.

There is some evidence bearing directly upon the question of good faith toward creditors on the part of the defendants. Minnie Gillispie lived with the defendants while they were building the house and for a short time before. She testifies that she heard J. M. Gillispie say to his wife they were going to buy the lot, and that he asked his wife to pay fifty dollars on it, and said, if she would do so, he would pay the balance. She further says Mr. Gillispie wanted the deed made to her, fearing something might happen, as it was while they were in the store, and there was a possibility of their breaking up and leaving them without a home. Mrs. O. E. Lynch says she resided at Addison at the time the Gillispies were married and that they boarded with her for a short time after they were married, and that at the time Mrs.

Gillispie had sixty dollars. She says Mrs. Gillicspic told her she had paid fifty dollars on the lot first purchased and that Mr. Gillispic had told witness he would pay the remainder on the lot. She further says: "He said he was going to buy and build them a home and he intended to put it in her name and that they was in business and she didn't know what might happen, and that if anything happened him it would leave a home for her and her family." Mrs. Lynch also says that in December, 1896, she was at the dwelling house of the Gillispies and "went to dress their baby and their articles of clothing were in the trunk; his wife requested me to get them out. I went to get the clothing and saw something tied up in a piece of zephyr cloth and, being very heavy to the looks of it, I opened it and saw what it contained and it was gold." She says there was very nearly a quart of it, and she had heard Gillispie say he intended to keep what gold he got. She also says she heard him say that if Watson were not always in his debt he would dismiss him from building the house.

The foregoing statement shows that the first lot was purchased, and the transaction sought to be impeached here was begun, before the debt here sought to be collected was originally contracted. Nearly four hundred dollars had been paid on the contract for the construction of the house prior to the giving of the notes represeting the original debt. This payment was made June 30, 1895, and the first note given to C. C. Miller bears date October 28, 1895, and the other one December 14, 1895. The testimony shows that the improvements, or at least the house, were completed early in the year 1896, not long after the debt was contracted. The note for one-half of the purchase money of the first lot became due August 18, 1895, but just when it was paid does not appear. The deed for the second lot was dated October 16, 1897, and Benjamin Hamrick's receipt for the entire purchase money of the two lots is dated October 22, 1897. It seems to be established by the evidence that the improvements were not completed until after the debt was contracted. If Gillispie furnished any of the money it was a gift to his wife, and stands upon the footing of a voluntary conveyance to her, for it is not pretended that she purchased anything from him. As to part of the gift or voluntary settlement, the plaintiff must be treated as a subsequent creditor and as to the

balance as an existing creditor. But if it be established that the gift was made with intent to defraud the creditors of Gillispie, either existing or subsequent, then it is wholly unimportant whether the plaintiff was a creditor at the time of the perpetration of the fraud or became a creditor aftetrwards. This is well settled in *Lockhard* v, *Beckley,* 10 W. Va. 87, where it is held that, "If it be shown that there was *mala fides* or fraud in fact, in the transaction, whether the actual fraudulent intent relates to existing creditors or is directed exclusively against subsequent creditors, the effect is precisely the same, and subsequent creditors may, upon the strength of such fraud, successfully impeach the conveyance." Nor is the distinction laid down in the books between fraudulent conveyances and voluntary conveyances very important here, for, in the same case, it is held that a conveyance or transfer may be fraudulent and voluntary at the same time. "A voluntary conveyance, as to subsequent creditors, is not void merely on the ground that it was voluntary, and the party indebted at the time it was made; yet upon the question whether it is fraudulent in fact, it is proper to consider the circumstances of its being voluntary, and the party indebted at the time; and if additional circumstances connected with these two be sufficient to show fraud in fact, it is void as to subsequent creditors." So the only inquiry here is, whether, upon all the evidence and the circumstances disclosed, there was fraud in fact within the meaning of the principles of law relating to fradulent conveyances.

During the period covered by the purchase and improvement of these two lots, J. M. Gillispie undoubtedly handled considerable amounts of money and had the opportunity to secrete in his trunk, in fraud of his creditors and of his co-partner, a considerable sum of money in gold, as stated by Mrs. Lynch. Probably not so much as she testified to, but she says she did not measure or count it. From his own testimony it appears that the firm of D. M. Miller & Co. carried on a considerable business, having assets at the time of the death of Miller amounting to about twelve thousand dollars and owing debts amounting to eight thousand, nine hundred dollars. Gillispie had been in the firm then for about four years. At that time he claims to have been worth about eight hundred dollars. It is not probable that he had been worth more than that at any other time of his connec-

tion with the firm. He says the firm had only six or seven hundred dollars over and above its indebtedness in the latter part of the year 1893, when the store was burned out. This may be urged as a reason why it devolved upon his wife to borrow money and provide a home, but it does not eliminate the fact that her husband was handling considerable amounts of money and could easily have diverted enough of it to make that provision. The crucial question is, whether he did it. It would be difficult to hold in the face of the evidence that the father of Mrs. Gillispie did not give and loan her the money which he says he did. The same is true as to what she claims to have borrowed from Hamrick. As to the loan made from Delbert Gillispie, there is less certainty as to his ability to make it, but he swears he did so and produces the note. But, in this connnection, it must be remembered that Mr. Skidmore did not apply this money himself to the purchase and improvement of the property nor did Mr. Hamrick or Delbert Gillispie. Nor in the case of Mr. Hamrick is it clear that his transactions were had with Mrs. Gillispie personally for she says that the hundred dollars paid Hamrick on the purchase money was handed to him by Mr. Gillispie, although it was her money. Hamrick himself speaks in general terms. Little, the man who did the painting, only mentions five dollars as having been paid to him in cash by Mrs. Gillispie. As to how much she paid in person to any of the contractors, she is silent, although she says she paid part of it in cash. Granting that she borrowed all the money she says she borrowed, it does not follow necessarily that she put that money into the property nor does it exclude the inference that it was paid for her by her husband. It only shows that she had some money which she could have paid on the property. But her husband had in his hands money with which he could have paid all on the property. She did very little of the actual paying. He did practically all of it. As to the money derived from keeping boarders, and sale of milk and butter, the evidence is uncertain and inconclusive, both as to the amount thus made and as to whether the profits belonged to the wife. Somebody had to cultivate the garden, the family had to be clothed as well as fed, and the groceries came from the store, and only the defendants testify that Mrs. Gillispie paid for them. There is not

even a book to corroborate them. Feed had to be furnished for the cows and that, no doubt, came from the store.

That the firm of D. M. Miller & Co. was carrying a considerable indebtedness during the period covering these transactions, is certain. Two witnesses testify directly to the declaration of an intention on the part of both Mr. and Mrs. Gillispie to purchase the first lot with the money of J. M. Gillispie, except as to fifty dollars of it, and have it conveyed to Mrs. Gillispie for the express purpose of providing a home for themselves against a possible reverse in business. In the absence of any showing to the contrary, the law would make this actual fraud against the creditors of the husband. These statements are denied by the defendants, but the circumstances of practically all of this business having been transacted by J. M. Gillispie, much of the work and materials having been paid for out of the store, and the absence of the account which Mrs. Gillispie claims to have had with the store, all tend to establish the execution of the purpose which these two witnesses say the defendants declared in their presence. There must be added to this the fact that a business, admittedly solvent in January, 1896, passed under the management of J. M. Gillispie and made money for another year, and became wholly insolvent and indebted to the extent of thousands of dollars in excess of its assets in January, 1898, unattended by any great sudden loss, as by fire, flood or other inevitable circumstance.

To overcome the presumption of fraud arising from the evidence and the facts shown, the wife must establish her purchase of the property with the means derived from sources other than her husband by full and clear proof. *Stockdale* v. *Harris,* 23 W. Va. 499; *McMasters* v. *Edgar,* 22 W. Va. 673; *Rose* v. *Brown,* 11 W. Va. 122; *Core* v. *Cunningham,* 27 W. Va. 206; *Herzog,* v. *Weiler,* 24 W. Va. 203; *Burt* v. *Timmons,* 29 W. Va. 441; *Spence* v. *Smith,* 34 W. Va. 697; *Martin* v. *Warner,* 34 W. Va. 182. "In a contest between the creditors of the husband and his wife, owing to the great facility which the married relation affords for the commission of fraud, there is, as there should be, a presumption against the *bano fides* of the transaction, which the wife must overcome by clear and satisfactory evidence." *Crowder* v. *Garber,* 34 S. E. (Va.) 470. This Court has de-

clared the same rule in different language in *Walker's Admx.* v. *Peck,* 39 W. Va. 325; *Woods* v. *Harmison,* 41 W. Va. 376.

Enough has been said to indicate clearly that the evidence adduced by Mrs. Gillispie in support of her contentions does not measure up to this requirement. Another familiar principle peculiarly applicable to this case is that "Fraud is to be legally inferred from the facts and circumstances of the case, when those facts and circumstances are of such a character as to lead a reasonable man to the conclusion that the conveyance was made with intent to hinder, delay or defraud existing or future creditors." *Lockhard* v. *Beckley,* 10 W. Va. 87; *Livesay* v. *Beard,* 22 W. Va. 585; *Sturm* v. *Chalfant,* 38 W. Va. 249. The evidence of actual payment by Mrs. Gillispie is narrowed down, as has been shown, to the testimony of herself and her husband, and numerous cases are found in the reports in which such evidence is held insufficient as against facts and circumstances giving rise to the inference of fraud. The rule was devised to cover just such cases. But for it, creditors would not often be able to impeach a fraudulent conveyance.

The defendants, by cross-assignment of error, say the court erred in overruling the demurrer to the bill but it is sufficient. It sets forth clearly and fully the indebtedness of the defendant, J. M. Gillispie, shows the recovery of the judgment against Gillispie and Mrs. Miller and the enforcement of the payment of it out of the real estate of Mrs. Miller in the chancery suit, and with it are filed as exhibits a transcript from the justice's docket showing the issuance and return of an execution unsatisfied; a copy of the decree ordering a sale of the real estate of Mrs. Miller and reciting the assignment of J. M. Gillispie; and a copy of the decree confirming the sale thereof. It further alleges that J. M. Gillispie paid the purchase money of the lots and had them conveyed to his wife with intent to hinder, delay and defraud his creditors, and that he procured the improvements to be put upon the property and paid for them with his own money, with the like intent. The prayer is that the lots may be held liable for the plaintiff's debt and sold and the proceeds applied to the payment of it. There is no allegation of the insolvency of J. M. Gillispie, but the fact appears from the exhibitis. That is sufficient. The exhibits are parts of the bill. *Sadler* v. *Taylor,* 49 W. Va., 104. It is also contended that

the bill should have marked the distinction between a fraudulent conveyance contemplated by section 1 of chapter 74 of the Code, and a voluntary conveyance as contemplated by the second clause of section 2 of said chapter. As has been shown, the bill sufficiently charges fraud, and the fact that the transfer is not upon a consideration deemed valuable in law may be treated merely as a fact tending to establish a fraud. The bill may properly treat it as matter of evidence and omit any mention of it.

Prior to this suit, another had been brought against the defendants by the Horner-Gaylord Company, to impeach the same transaction on the ground of fraud, and, in that suit, the depositions of Mary E. Gillispie, J. M. Gillispie and Delbert Gillispie were taken and filed. These depositions seem to have been filed by the defendants in this suit, as exhibits with their depostitions taken herein. "The rule is that depositions taken in one suit cannot be used in another suit unless the parties are the same or are in privity and the subject involved in the suit is also the same." 6 Ency. Pl. & Pr., 579. It excludes the depositions in the former suit for neither the parties nor the subject matter are wholly the same. Another principle having the like effect asserted in *Brown* v. *Johnson,* 13 Grat. 644, is that : "A man who cannot be prejudiced by a deposition or proceeding in a suit, shall never receive any advantage from it." In *Brown* v. *Jackson,* an action against one obligor on a joint bond, an attempt was made by the defendant to use a deposition taken in another action by the plaintiff on the same bond against another obligor, and the court held that, under no circumstances, could it be competent evidence. See also *Payne* v. *Coles,* 1 Munf. 373, and *Chapman* v. *Chapman,* 1 Munf., 398. The plaintiff could not have used these depositions against the defendants except by agreement, or in a limited sense for purposes of contradiction.

But the exception must be treated as waived by failure to insist upon it in the court below. This rule of waiver extends to all exceptions save those going to the competency of the witness, as to which, indeed, no exception is necessary. *Hill* v. *Proctor* 10 W. Va. 78; *Vanscoy* v. *Stinchcomb,* 29 W. Va. 271; *Fant* v. *Miller,* 17 Grat. 187.

For the reasons given, the decree complained of must be re-

versed, the appellant must be decreed her debt and costs as a charge upon the property in question, and the cause remanded for further proceedings in accordance with the principles herein stated, and the rules and principles of equity.

                                                             *Reversed.*

UPON RE-HEARING.

(Dec. 16, 1903).

This case was decided and the foregoing opinion filed November 22, 1902, and afterwards a rehearing was allowed. The briefs for appellee, filed upon the re-argument, as well as upon the first hearing, are unusually long, but their contents may be reduced to a few propositions. One is, that the rule which casts upon the wife who claims, in a contest against the creditors of her husband, to have purchased and improved real estate, the burden of proving that the property and improvements were paid for by her with money derived from some source other than her husband, ought to be abolished, because the statute now authorizes a married woman to carry on business in her own name and to acquire and hold property free from her husband's control and from liability for his debts. In this connection, it is urged that this rule has been abolished in Virginia by the decision in *Callett* v. *Alsop* 40 S. E. 34, or that the principles there declared, if followed out, will produce such result. That case seems to liberalize the rules of law to some extent in such contests, but it does not hold that this particular rule, which has been so long the well settled law in all jurisdictions, is to be overturned. It holds that an insolvent husband may be employed by his wife in the management and conduct of her business, and that his earnings in her employment may be devoted to the support of his family as far as may be necessary for that purpose and his creditors are only entitled to subject, to the payment of their debts, the excess. This Court, long ago, enunciated and applied substantially the same proposition in *Boggess* v. *Richards,* 39 W. Va. 567. That is a matter entirely foreign to any question arising in this case. In establishing the presumption of fraud as to transactions between husband and wife, working prejudice to the rights of the creditors of the former, the courts do not assign, as reason therefor, the common law disabilities of the wife. They base it upon the close relation-

ship of the parties, and the facilities which that relationship affords for the perpetration of fraud. That relationship is in no manner altered by the married woman's statute. If that statute has any effect in this connection, it is to increase, rather than to diminish, the facility for the perpetration of such fraud. There is greater latitude under it for the wife to set up claims to property and to hold property than there was at common law. It is urged, however, that this rule has the effect of trenching upon the rights of married women under this statute, and of partially thwarting the purpose of the legislature in passing the statute. Married women had property rights before the passage of this law, which were as sacred as their new rights. Had the courts deemed this rule prejudicial and injurious to their rights in the sense of depriving them of anything which belong to them, it never would have had any existence in the jurisprudence of this country. The same principle is applied by the courts everywhere to persons standing in a close confidential relation, such as father and son, brother and brother, brother and sister, and all others closely related by blood or affinity. Why? Because of the relationship, and the relationship of husband and wife, being closer than that of any others, the principle is more rigidly applied as between them. See *Burt* v. *Timmons,* 29 W. Va. 441; *Spence* v. *Smith,* 34 W. Va. 697; *Knight* v. *Capito,* 23 W. Va. 639; *Douglass* v. *Douglass,* 41 W. Va. 13; *Himan* v. *Thorn,* 32 W. Va. 507; *Reilly* v. *Barr,* 34 W. Va. 95; *Hutchinson* v. *Boltz,* 35 W. Va. 754; *Butler* v. *Thompson,* 45 W. Va. 660; *Bierne* v. *Ray,* 37 W. Va. 571; *Ballard* v. *Chewning,* 49 W. Va. 508. The rule exists *ex necessitate.* But for it, the statute against fraudulent conveyance could not be made effective.

That part of the opinion which recites that somebody had to cultivate the garden and the family had to be clothed as well as fed and feed furnished for the cows, has been adverted to in the later briefs as evidence of the application of a false principle. It was not apprehended that this would be construed to mean anything other than an indication of the weakness of the claim that Mrs. Gillispie had realized a large amount of money from keeping boarders with which to pay for the property and improvements. How could she have paid her share of all the expenses of keeping the boarding house, and turned in on the purchase of the property and its improvements all the money taken

in from her boarding house business? Are we to accept the absurd proposition that every dollar of the income was profit, allowing nothing for expenses? Can a married woman's business be carried on without expense any more than that of any other person? In her statement of the amount of money derived from her business of keeping boarders, she allows practically nothing for the expenses, and the statements of the former opinion referred to were intended merely to direct attention to this fact.

The statement in the former opinion that certain depositions, taken in another suit and made exhibits with depositions taken in this suit, do not appear in the printed record, is erroneous. They are in that record and were read and considered under the impression that they were depositions taken in this case. This error is the result of the unusual and peculiar manner in which they are inserted in the printed record. But it signifies nothing. In going back over the record, they are found to have been marked and considered as carefully as any of the others. Further examination of this record serves to strengthen, rather than to weaken, the conclusion announced in the former opinion. That conclusion was that the evidence offered to show that Mrs. Gillispie paid for the property with her own money was insufficient to overcome the presumption against the good faith of the transaction, as it appeared that practically all the money was actually handled and delivered, by way of payment, by J. M. Gillispie, and not Mary E. Gillispie, and, further, that J. M. Gillispie was, at that time, handling other money than that which Mrs. Gillispie claims to have paid into his hands. The truth of this inference is established, to a moral certainty, by certain facts found in the record and marked on the former examination of it, but, as the result of inadvertence, not stated in the opinion. It appears from Ledger No. 1 of the books of D. M. Miller & Co., as testified to by G. A. Lynch, from the book itself, that J. M. Gillispie was allowed, as expenses, from the firm, on the 23rd day of August, 1894, $274.92; on January 15th or 17th, 1895, $480.08; on August 29, (year not given,) $207.18; on January 13, 1896, $141.71, making a total of $1,103.89. This amount, which seems to have been withdrawn from the firm by him without anything upon the books to show for what purpose the money was expended, or upon what accounts it was taken out, was used for some purpose by J. M. Gillispie, from time to time, while the

purchases of property and payments of the costs of improvements thereon were in progress. Hence, the record shows more than mere opportunity on the part of J. M. Gillispie to obtain the money with which to buy this property for his wife. It shows that he did actually withdraw, from the firm assets, a considerable amount of money at that time which is wholly unaccounted for by him, and cannot be accounted for, upon any theory except that of his having paid it, instead of Mrs. Gillispie's money, for the property and the improvements thereon. This circumstance strongly supports the conclusion that the property was paid for with the husband's money and greatly weakens the contention of Mrs. Gillispie that it was paid for with her money.

Another contention is that, as the house in question was completed late in the year 1895, or early in the year 1896, and the assignment of the husband did not occur until in the year 1898, he was solvent at the time of the purchase and improvement of the property and might have made a valid gift to his wife. This is not the theory of the defense. Both husband and wife testified that the purchase was made by her with her own money. However, it affirmatively appears that the husband's financial condition was such as to render his inability to make such a gift to his wife without prejudice to the rights of his creditors perfectly apparent. It is not a case of a wealthy man, or a well-to-do man, having good reason to believe himself able to make a substantial gift to his wife without injuring his creditors, and, therefore, to act in good faith in doing so. Such gift, to be valid, cannot be made under any other conditions. *Hume* v. *Condon,* 44 W. Va. 553.

Finally, it is urged that the court should find that Mrs. Gillispie had invested a considerable amount of her own money in the property and its improvements, and become vested with the legal title, whereby the propety has become her separate estate, and that the amount of her interest in it should be fixed, and then the amount expended in the purchase and improvements by her should be protected and secured to her by the decree; in other words, that an apportionment of the value of the property be made between the wife and the husband's creditors, as in the case of *Humphrey* v. *Spencer,* 36 W. Va. 11, and *Boggess* v. *Richards,* 39 W. Va. 576. As this is a case of actual fraud on the part of the husband, participated in by the wife, the principle

invoked does not apply. *Humphrey* v. *Spencer* expressly decides that such apportionment can be made only in cases in which there is no actual fraud. The law applicable here is that declared in *Lockhart* v. *Beckley,* 10 W. Va: 87; *Rose* v. *Brown,* 11 W. Va. 137; *Bank* v. *Wilson,* 25 W. Va. 242; and *Burt* v. *Timmons,* 29 W. Va. 441, all of which hold that the wife's property is to be charged with the amount of the husband's money which went into the improvements, although that may amount to the entire proceeds of the sale of the property.

As it clearly appears that money of the husband, in excess of the amount of this debt, and the costs of this suit, was used in the purchase and improvement of the property, the order directed in the former opinion should be entered.